WILLIS MILLICAN AND OTHERS v. JOHN MILLICAN AND OTHERS.

The recital, in the proceedings and decree of the Probate Court, making partition of an estate, that all the heirs were present, or represented, and consenting thereto, must be taken to be true, until the contrary is shown.

That a letter of attorney from some of the heirs, is found among the papers of the estate, does not show that none others were represented.

If one who was not a party to the partition, accept the portion allotted to him, and afterwards convey it by deed, referring to the partition as his source of title, he will be concluded as respects the property embraced in the partition.

That parol testimony is admissible, to show that an absolute deed or grant for land, was made and accepted as a trust, is too well settled by the decisions of this court, to be now an open question.

A voluntary disposition of property by deed, which is not intended to operate a present transfer, but is only to take effect after the death of the donor, is testamentary.

Under the now repealed statute of wills, such a conveyance could only have taken effect to the extent of the disposable portion, by will, of the donor's property.

That the donor was advanced in years, and resided with her son, one of the donees, who performed the part of a dutiful and affectionate child, managing and taking care of her property, does not warrant the conclusion, that an absolute deed was not intended as a present disposition, but was to take effect after the death of the donor.

If the conveyance were absolute, and conveyed the property unconditionally to the donee, it cannot be set aside, as in fraud of the statute of wills of 1840; although the purpose and object of the donor, in making the deed, was to prevent her heirs from inheriting the property.

Where a deed imports an absolute transfer of the property, the burden of proving the contrary, is upon the party attacking it.

To avoid a deed for undue influence, it must be shown, that the influence ex-

isted, and that it was exercised for an undue purpose. The former may be inferred from the relation of the parties; the latter must be determined from the nature and results of the transaction.

Equity will not, when there is no peculiar or confidential relation between the parties, set aside a voluntary deed, however improvident, unless other cause be shown.

Proof of the facts which will, in such case, avoid the deed, devolves upon the donor; for it is *primâ facie* valid.

The influence which a dutiful child may exert over a parent, by acts of filial duty and obedience, or that which flows from mutual confidence and affection, is not "undue influence," which will avoid a deed.

But it is that influence which is acquired by one person over another, of sanity for general purposes, and of sufficient discretion to regulate his affairs in general, which prevents the exercise of his discretion, and destroys his free will.

In the case of a gift from a child to a parent, undue influence may be inferred from the relation itself; but never when the gift is from the parent to the child.

And where it is from the child to the parent, although the courts will carefully watch and examine the circumstances attending the transaction, it is, it seems, *primâ facie* valid; but however this may be, no suspicion whatever attaches to a conveyance by the parent to the child.

Though there is no doubt that a deed from a parent to a child may be set aside, upon proof of undue influence being actually exercised by the latter.

Old age alone is not a ground for presuming undue influence, though it may be considered, in estimating the fairness of the transaction, where there is evidence tending to show imposition.

The transaction of the business of the donor as administratrix of her deceased husband, and the superintendence of her out-door affairs generally, by her son, the donee, does not constitute such an agency, that her deed will, *primâ facie,* be imputed to undue influence.

Such agency is distinguishable from the known relations of guardian and ward, attorney and client, trustee and *cestui que trust,* to which a stricter rule is applied.

If a case, submitted to the judge, has been correctly decided, the judgment will not be reversed, because he may have heard evidence not legally admissible.

APPEAL from Brazos. Tried below before the Hon. Charles A. Frazer.

This suit was instituted by the appellants, as the heirs at law of James D. Millican, deceased, to re-open the succession of Robert Millican, the father of the said James D. Millican, and of Nancy Millican, his mother, and also of William Templeton

Millican, his brother, who died without issue; to set aside certain conveyances made by the said Nancy Millican, in her lifetime, to the defendants John Millican and Elliot M. Millican; and to recover from them the interest of the said James D. Millican, in the estates of the said Robert, Nancy, and William Templeton Millican.

The plaintiffs subsequently amended their petition, and admitted that James D. Millican was not, under the law in force at the time of the death of the said William Templeton Millican, one of his heirs; but that his mother, Nancy Millican, who was then alive, was his sole heir, and inherited all of his estate; and they claimed it as a part of her estate.

The defendants, John and Elliot M. Millican, answered, that the estate of Robert Millican had been legally partitioned and distributed, by the Probate Court of Washington county; and that the plaintiffs had received their portion of the estate. That Nancy Millican had conveyed all of her property to them, (the defendants,) in her life-time, and had no estate at the time of her death; making the deeds from the said Nancy to them, parts of their answer.

The plaintiffs replied to the defendants' answers:

1. That the Probate Court of Washington county, acquired no jurisdiction to partition the estate of Robert Millican. First, because Nancy Millican, the administratrix, was not notified. Secondly, because the proceedings in the said court showed, that James, Daniel, Diadem, Andrew and Letty Ann, who were children of Robert Millican, had died, leaving children, yet the said partition was made without showing who they were, or citing them to appear, or making them parties thereto.

2. That the deeds from Nancy Millican to John and Elliot M. Millican, were executed while they acted as her agents and confidential advisers, and were procured through an undue influence, which they exerted over her; that she was old, infirm, and incapable of transacting her own business; and that she did not know the value of the property she conveyed, or the nature of her rights.

3. That the deeds and bills of sale, from Nancy Millican to John and Elliot M. Millican, were pure donations, and intended to evade the statute of wills in favor of forced heirs.

4. They admitted that five quarters of the two and a half leagues of land, granted by the government to Robert Millican, had been divided among the heirs, and that they had acquiesced in the division; but insisted that the other five quarters, together with all the property owned by Nancy Millican, should be divided.

The opinion will be understood without a statement of the facts. A jury was waived, and the cause submitted to the judge, who gave judgment in favor of the defendants, from which the plaintiffs appealed.

*A. M. Lewis,* for the appellants.—The decree of the Probate Court of Washington county, was not binding upon the heirs of James Millican, nor upon Nancy Millican, through whom they, in part, claim.

It is a rule of universal application, in all civilized countries, that a person's rights shall not be adjudged to his prejudice, until he, or those through whom he claims, has had an opportunity of being heard. (Ragan's Estate, 7 Watts, 438.)

In the case of Jackson v. Brown, 3 Johns. Rep. 459, "where one of several tenants in common had alienated his share, and the plaintiff in partition proceeded as if no such alienation had been made, by giving notice to the original co-tenant, without taking notice of the grantee, the judgment in partition was held to be void."

From the authorities above cited, it is clear that, if the decree of the Probate Court of Washington county was rendered when all the parties interested in the partition were not legally before the court, that court acquired no jurisdiction, and its decree is utterly null and void. Now, were all the parties before the court? As shown above, it will be seen from the records of the proceedings in that suit, that the widow, Nancy Millican, was alive at the time the partition was rendered, and was entitled to one-half

of the estate. But it does not appear that she was before the court, or was represented in that suit, unless the declaration of the attorney of the plaintiffs, that he represented all of the remaining heirs, can be construed to include her. This construction, however, cannot be given to his declaration; for she can in no acceptation of the term, be called an heir. Besides, by referring to the transcript, it will be seen which of the heirs authorized him to act in the premises, and she is not one of them. The record in that suit also disclosed, that several of the children of the intestate have died, leaving issue; and it was not shown who, or in what condition, they were. They, surely, could not have been considered before the court, when their names were not even given. It was also shown from the record, that these plaintiffs were represented by John H. Millican, as their guardian, and the only evidence of his guardianship was his own declaration of the fact, and the record of Brazos county, showing that he had taken some of the preliminary steps for that purpose. The mere declaration of his, that he was the guardian, is not sufficient, and the record does not show that he was ever appointed guardian. Thus, then, it appears that Nancy Millican, the heirs of the deceased children of the intestate, and the plaintiffs in this cause, were not before the court at the time the decree of partition was rendered. We repeat, therefore, that the court had no jurisdiction, and its decree is utterly void, and not binding upon these plaintiffs. This is even a stronger case than those above referred to. In the case of Ragan's Estate, 7 Watts, 438, above cited, one of the heirs, who, it was alleged, had received advancements to an amount exceeding his distributive share, was not cited before the court, and the decree was held to be void.

Can the deeds and bills of sale from Nancy to John and Elliot Millican, stand?

The appellants contend, that so far as that portion of Nancy Millican's estate, which she acquired as the heir of William Templeton Millican, is sought to be affected, it has all the objections to it which will be noticed hereafter, together with this

additional one, that John Millican had been the administrator of that estate until the last Monday in April, preceding the 4th of August of the same year, and that consequently, he was incapacitated from taking the property, even at a fair price, until he had not only closed and accounted for his administration, but, also, communicated all of the information he had acquired in his fiduciary capacity, to his *cestui que trust.* "He must show that he took no advantage whatever of his situation; that he gave to his *cestui que trust* all of the information which he possessed, or could obtain, upon the subject; that he advised her as he would have done in relation to a third person offering to become a purchaser, and that the price was fair and adequate; and the *onus* of proving all this, is upon the executor. And these principles apply to all the relations where confidence is reposed—to agents, attorneys, solicitors, guardians," &c. (1 Leading Cases in Equity, 169.) The above extract is taken from a note to the case of Fox v. Mackreth, beginning at page 125, of White & Tudor's Leading Cases in Equity, and it seems to be based upon the principle, that wherever confidence is reposed, the person so confided in, shall take no advantage of it for himself. (See also Hunt v. Atkins, 8 Eng. Ch. Rep. 495.)

But we will not multiply authorities, as much that follows is applicable to this branch of the case. That John Millican was trustee for his mother Nancy, will not be questioned; and there is no pretence that she was ever informed of the nature of the estate, its value, or her rights. And from the charge in the inventory of her estate, as shown from the tax books, in this transcript, it is fair to infer, that a part of the land, owned by her, was held by survey; and from the deeds, it is certain, that it was at a distance from her.

There was no effort to show that he paid a full price, or any price at all, for the property acquired from Nancy Millican, and from the testimony of the witnesses, it cannot be believed, that she received the amount of money expressed in all of the deeds. All of the witnesses testify that she was frugal; none of them had ever known of her having spent any money. She died about

four years after the execution of the deeds and bills of sale, having lived in the same house with John Millican; and he returns an inventory of her estate at *fifteen dollars.*

Add to this, that J. Crosby, one of the witnesses to the deeds, and the witness who proved them up for record, was alive after the institution of this suit, and that they did not attempt to prove by him, that any price was paid for the property, and "out of his own mouth is he condemned."

The next inquiry, is so intimately connected with the one that has preceded it, as to leave it doubtful, whether the attempt to separate them, is more calculated to facilitate, or retard the proper investigation of this cause.

The appellants contend, that the defendants were the confidential advisers of their mother, and that the deeds and bills of sale, from her to them, were obtained by means of the abuse of that trust and confidence. To sustain this position, it is not absolutely necessary for us to establish the imbecility of Nancy Millican. It rests on the confidence reposed, more than on the capacity of the person reposing it. But if the plaintiffs' cause depended on establishing that she was in her dotage, we should not entirely despair. It is true, that many of the witnesses represent her to have been possessed of a strong and vigorous intellect. The strongest evidence upon this point, is that of Mrs. Rector, who represents her in one place, as being capable of managing any business; but this is qualified, to mean the ordinary business of her sex, for she declares, that women are not as capable as men to transact such business, as that of administering an estate. This is also shown from the fact, that she did actually intrust all of her out-door business to her son. Again, we may venture the assertion, based upon a well known quality of the human mind, that as a man grows older, after full maturity, his bodily and physical energies gradually fail. A change may not be perceived in the lapse of a year, or even a decade. It seldom takes place so suddenly, that the vigorous man of the night, rises decrepit with age in the morning. But although no marked difference may be perceived, between his appearance of to-day, and of

yesterday, yet time continues to make its ravages upon him, until in the lapse of years he becomes a child again. Nancy Millican was between eighty and ninety years of age; was the mother of many children, and if there was no defection of the mind, it was an exception to the general rule. This case is stronger than that of Huguenin v. Baseley, 14 Vesey, 273; or Whelan v. Whelan, 3 Cowen, 537; or Taylor v. Taylor, 8 Howard, 183; or Rankin v. Porter, 7 Watts, 387. All of these cases will also be found cited in the leading case of Huguenin v. Baseley, in 2 Leading Cases in Equity, part 2, page 38. In that case, the defendant had permitted the plaintiff, after he knew that she reposed confidence in him, to take her business out of the hands of her solicitor, and place it under his control; and at her dictation, he wrote a letter to her solicitors, giving directions for the delivery of papers to the defendants; and the general supervision of her estate was committed to him. By referring to the opinion of Lord Chancellor ELDON, delivered in this case, it will be seen, that he did not base the relief upon the ground, that Baseley had induced her to make such improvident conveyances, or that he instilled the distrust which she entertained for her solicitors, but upon the ground, that he, knowing that she reposed confidence in him, permitted her to write the letter and make the deed. Lord ELDON says, " who dictated that letter, is of very little importance. If at her dictation he wrote it, and permitted her to send it, that is the most direct communication to him, of the nature and extent of the confidence she placed in him, and the language of a court of justice has in all times been, 'that if a man does not choose to act upon the confidence, appearing in the course of the transaction to be so reposed in him, he ought to reject it as soon as proposed.' "

Compare that case with the one under consideration: Nancy Millican was an old lady, and no matter whether it was from bodily or mental infirmity, or from the very nature of her business, as unsuitable to her sex, she was under the necessity of calling to her assistance, and reposing confidence in some one, in the management of her affairs. She had but two sons living,

after the death of William Templeton, and she intrusted her business to one of them, John Millican. He transacted all of her business, except her household affairs; even paying taxes for her. It is not necessary that the appellants should show, that he created, or even encouraged, the ill-will which she felt towards her son James, and still continued to nourish against his off-spring, who appear never to have offended her, or to show that he created or fostered her uneasiness, on account of an *imagined debt* (of which there is no evidence,) *she supposed she owed him.* It is sufficient to show, that he knew she reposed the utmost confidence in him, and that he permitted her to act under these false impressions, and to give the greater portion of her estate to him, and the remainder to his brother, leaving herself nothing but her *bed and arm-chair.*

Nor was it incumbent upon the appellants to show, that it was by *his* means that *his* attorney was called· to write her deeds, when no one else was present, so that it was rendered necessary that the attorney should sign them as a witness. It was his duty to show that others were present, and were consulted, and that he took no advantage whatever of his situation. The *onus* of proving these facts, rests on him. Nor was it the duty of appellants to show, that the same attorney, who was called in 1843 to write a will, was prevented, by the insinuations of John Millican to his mother, from proceeding with it. He was her confidential adviser, and was bound to see that she was not imposed upon, either by himself, or others.

But is not the inference a natural one, that he created the unkindness on her part, for her son James, and kept it up against his children? It is rare, that maternal ill-will lasts very long, and rarer, that the anger of a mother towards her son, is fostered against his children, who have committed no fault. And is not the inference equally as strong, that the attorney was prevented, in 1843, from writing a will for her; and that he induced her to believe that she owed him a sufficient amount to consume her estate? The only difference, in principle, between the case of Huguenin v. Baseley, and the case under consideration, is this:

In that case, the influence was obtained through the sacred character of a minister; in this, through the fond regard of a mother. But it makes no difference how that influence was obtained. As stated by Lord COTTENHAM, in the case of Dent v. Bennett, "the relief stands upon a general principle, applying to all the variety of relations in which dominion may be exercised by one person over another." (4 My. & Cr. 277; also, 2 Leading Cases in Equity, part 2, p. 55.) Was there dominion obtained in this case?

In the case of Whelan v. Whelan, 3 Cowen, 537, the facts were these: An old man, far advanced in years, and somewhat impaired in intellect, although not absolutely imbecile, or unfit for the transaction of business, had separated from his wife and family, keeping with him only two of his sons, to whom he intrusted the care of his farm. Legal proceedings were instituted by his wife, for a separate maintenance, which induced him to form the erroneous impression, in which he was confirmed by the language of one of his sons, that his whole estate would be taken from him, for the payment of his debts. His uneasiness finally became so great, that he executed a conveyance of all of his estate to his sons, in trust for himself and brother. These circumstances were held to show such a case of influence, unduly and disadvantageously exerted, as to justify a decree, avoiding the conveyance, not only as to the son, by whom it was procured, but also as to the other son, who was not accused of having any share in inducing him to make the conveyance. On both points, the court adopted the doctrine laid down in Huguenin v. Baseley.

The difference between the case of Whelan v. Whelan, and this case, is too trifling to justify much examination. Both were old persons, far advanced in years, and probably not exempt from the infirmities incident to mind and body, in the last stage of human life. In this second childhood, a surrender of business into other hands, became indispensable.

In that case, Whelan had become incapable of conducting his business; in this, Nancy was always incapable of conducting her affairs. In that, Whelan was credulous, and easily persuaded;

in this, Nancy was suspicious, but relied on John and Elliot, who had great influence over her: so that in that case, Whelan was subject to be the dupe of many; in this, Nancy the victim of but two. The following language, therefore, used in that case, is not inapplicable to this: "It cannot be doubted, that she was placed in a situation highly favorable to the view of the respondents. They had full opportunity of operating on her hopes and fears."

In the case of Taylor v. Taylor, 8 Howard, 183, there was nothing to show the exact nature of the influence brought to bear upon the grantor, to induce him to make the conveyance. The Supreme Court, however, adopted the doctrine laid down in Huguenin v. Baseley, and Dent v. Bennett.

In the case of Rankin v. Porter, before cited, there was no pretence of weakness of intellect, on the part of the grantor. Nor was the grantee clothed with any fiduciary character, either by law, or by any formal deed. He had merely volunteered to act for the grantor, and a decree was rendered against him, solely upon the ground, that confidence had been reposed, and abused.

The cases above cited, all seem to approach pretty near to direct fraud; as, we believe, this does. But we maintain, that when confidence is reposed on one side, coupled with an injury on the other, even where there is no ground to impute unfair dealing, the transaction cannot stand. (2 Leading Cases in Equity, part 2, p. 274; Slocum v. Marshall, 2 W. C. C. Rep. 397.)

It is further contended, for the appellants, that the deeds and bills of sale from Nancy Millican, were a mere artifice, intended to avoid the statute of wills. (Hart. Dig., Art. 3251, 3263, 3264, 3265; Parker v. Parker, 10 Texas Rep. 83; Hagerty v. Hagerty, 12 Id. 456; Charle v. Saffold, 13 Id. 94.)

It may safely be assumed, as a rule of law, that whatever cannot be done directly, cannot be done indirectly. (Hunt's Heirs v. Robinson's Heirs, 1 Texas Rep. 748.) It would be an absurdity to prohibit a man from disinheriting his son, and yet

allow him to evade the prohibition, by any indirect means. Now, it will be remembered, that in 1843, Nancy Millican had in contemplation the making of a will; and that she sent for Col. Crosby to write it. It is difficult, therefore, to resist the conclusion, that from some information she then received, she became aware that she could not effectually dispose of all her property to her preferred heirs, by will. It may, with some force, be asked, why she did not then make the contemplated deeds?

There is no evidence that she did not; and that, after the decrees of the Probate Court of Brazos and Washington counties, she made more formal conveyances. But this is mere conjecture. Admitting that she did not execute the conveyance at that time; the reason she did not, perhaps, was because all of the preparatory steps of having the property designated, in due form of law, had not been gone through with, until just before the date of these deeds and bills of sale.

Another significant fact is, the secrecy with which this business was transacted. Ordinarily, the making of a will is kept secret; but the reverse is the case, as to other conveyances. The vendee, for his own security, generally spreads his title on the record. In this case, we find no one who testifies that he knew of the existence of these deeds, until the suit of the plaintiffs *trumped them up*.

We have, we trust, shown that the remainder of the estate of Robert Millican, after deducting therefrom a league and a quarter, (about which there is no controvery,) ought to be divided and partitioned; that the whole estate of Nancy ought to be distributed; that one of the defendants, as to part of her estate, stood in such direct and known relation of trustee, up to within so short a time before the conveyances to him, from Nancy, were made, as to render it incumbent upon him to show that his *cestui que trust* was placed upon her guard concerning the conveyance, and to show that the transaction was fair, in every particular; that one, if not both of the defendants, held such confidential relations with Nancy Millican, as to preclude him from holding under the deeds, unless he have shown that he dealt with her *at*

*arm's length,* and that the conveyance was fair and proper; and that the conveyances were mere devices, to avoid a law of the land, based upon the purest principles of morals and sound policy; for it may well be urged as a reason for the law as it then existed, that the least worthy of the children, will often *hang* around an aged and indulgent parent; and by dint of perseverence, as it were, oblige him to bequeath all of his property to him.

Before dismissing this branch of the case, we again call the attention of the court to the extreme old age and helplessness of the donor, Nancy Millican, who, if not in her dotage, or second childhood, was an exception to the general rule; and who was so ignorant, as to be frightened with the miserable humbug, that her eldest son might set up a claim to the estate of Robert Millican, and with the unfounded apprehension, that she was largely indebted to one of the defendants. And we submit, that the strongest proof should have been required, in the face of these facts and circumstances, to show that she was sufficiently sane to have been fully apprised of the extent of her rights, or the effect of these deeds of conveyance.

*W. S. Oldham, F. L. Barziza* and *George F. Moore,* for the appellees.

WHEELER, C. J.—The plaintiffs, heirs of James D. Millican, seek to recover in this action, his distributive share of the estates of his father, Robert, and his mother, Nancy Millican. The defendants, John and Elliott Millican, oppose to the plaintiffs' claim, the administration, and final settlement and distribution of the estate of Robert Millican, in the Probate Court, in 1845, and the deeds of Nancy Millican of the 4th of August, of the same year; under which they claim to be entitled to retain the property in their possession, derived from the distribution of the estate of their father, Robert, and by conveyances by deed from their mother, Nancy.

The plaintiffs do not seek to disturb the partition of the league and a quarter of land, embraced in the decree of the Probate

Court, a part of the grant of two and a half leagues to their ancestor, Robert Millican; but they claim that they are entitled to a distributive share of the league and a quarter of land, embraced in the grant, which was not partitioned by the decree; and they insist, that they are not concluded by the partition and distribution of the estate by the Probate Court, because Nancy Millican, the widow of the intestate, Robert, and administratrix of his estate and certain of the heirs not named, were not parties thereto.

It is true, the petition for partition and distribution of the estate, was in the name of John and Elliott, the former being at the time the agent of the administratrix, in conducting the matter of the administration, and the administratrix is not named as the party petitioning. But it is stated, in the order awarding the writ, and appointing the commissioners to make partition, that the heirs of the intestate, including the present plaintiff, John H. Millican, in person, and as guardian of the minor heirs of James D. Millican, under whom the plaintiffs claim, were represented in court, and consenting to the action of the court. It is also stated in the report of the commissioners, and in the final decree of confirmation of their report, which embraces also the final settlement of the succession and discharge of the administratrix, that these, and the other heirs were present, or represented, and consented thereto. The contrary has not been shown; and until it is made to appear, the recitals in the proceedings and decree must be taken to be true.

The letter of attorney from a part of the heirs, found among the papers, cannot be deemed to establish, that none others were represented in court. The widow and administratrix, though not named in the petition for partition, distribution, and final settlement, appears to have been a party before the court, upon the rendition of the decree. It is therein stated that she, on that day " accounted for her actings and doings," in the matter of the administration; and it contains an order for her final discharge.

But if she was not a party to the partition, she accepted the portion of the estate allotted her by the judgment of the court,

and afterwards conveyed it away by deed, referring therein to the decree of partition as the source of derivation of her title. It would seem, therefore, that the widow, and those claiming under her, and the heirs of the intestate, must be deemed concluded by the partition, as respects the property embraced therein.   But if not, the proof is, that the distribution made was fair and equitable.   The plaintiffs appear to have received and receipted for their interest in the personal estate adjudged to them; and they have shown no equitable ground for disturbing the distribution.

It is unnecessary to notice the charges of fraudulent concealment of property, and intermingling of property of the defendants with that of the estate in the administration, and other alleged wrongs, which are wholly unsupported by evidence.   The plaintiffs admit that, as respects the league and a quarter of land, or half of the grant to Robert Millican, the partition was fair and equitable.   The gravamen of the complaint appears to be, that the other league and a quarter, or the entire grant, was not partitioned, and their share set apart to them; and they ask that it be now surveyed and partitioned.

In opposition to this claim, and as evidence of title in themselves, the defendants introduced the records of the several judgments of the District Court of Washington county, rendered in 1843, establishing that the grantee, Robert Millican, received the grant of two and a half leagues, in consideration of having five sons, who were of sufficient age to receive grants of land, and who were single men, and entitled each to one-fourth of a league, and that the grant was made to the father, and accepted by him, upon the express trust, that he should convey to each of these sons their one-fourth of a league, out of the grant to himself, and vesting title in the sons accordingly.

The defendants also introduced the testimony of witnesses, fully establishing that such was the trust upon which the grant was made and accepted.   The evidence was objected to by the plaintiffs; but the admissibility of parol evidence, to establish

such a trust, is too well settled by the decisions of this court, to be now open to discussion.

There were objections made also to the introduction of the records of the suits determined in the District Court of Washington county; but as the objections do not appear to be relied on in this court, they need not be noticed, further than to say, that these were suits for specific performance, properly cognisable in the District Court; and the judgments appear to have been rendered with all the necessary parties before the court. (Thompson v. Duncan, 1 Texas Rep. 485; Kegans v. Allcorn, 9 Id. 25; Shannon v. Taylor, 16 Id. 413.) They were the judgments of a court of competent jurisdiction, and must be held to conclude the plaintiffs, as to the matter therein adjudicated. They establish conclusively, that the league and a quarter of land, part of the grant to Robert Millican, not included in the partition of the estate, did not belong to the estate; and consequently, that the plaintiffs' claim to have it partitioned, as a part of the estate, is unfounded.

This disposes of the case, in so far as the plaintiffs seek a recovery of a distributive share of the estate of Robert Millican, and brings us to the principal question in the case, which is, as to the validity of the deeds of Nancy Millican, of the 4th of August, 1845, under which the defendants claim title to the property sought to be recovered by the plaintiffs, as a part of her estate.

Two principal grounds are relied on by the plaintiffs, to invalidate the deeds in question. It is insisted, 1st. That they were voluntary donations, not intended to take effect until after the death of the donor, and were in fraud of the statute of wills, in force when these dispositions were made, (O. & W. Dig. 750,) and the rights of the plaintiffs, as forced heirs of the donor. 2d. That they were obtained by undue influence, exercised by the defendants over the donor, and are, therefore, void.

It is settled by the decision of this court, in Crain v. Crain, 17 Texas Rep. 80, s. c. 21 Id. 790, that under the now repealed statute above cited, voluntary dispositions of property by deed,

which did not operate, and were not intended to operate, a present transfer of the property out of the donor, or to vest a present interest in the donee, but were made to take effect only after the death of the donor, were testamentary in their character, and could have effect only as wills, and to the extent of the disposable portion by will, of the property of the donor. Was the present such a disposition? Did the deeds in question operate no present disposition of the property, or pass no present interest? Was their execution unattended by any transfer of the property? Were they made and intended, not to take effect in the life-time of the donor, but only after her death, reserving to herself the control and disposal of the property during her life, and revocable by her at pleasure? Were they, not what they purport to be, absolute deeds of conveyance, but, in fact, testamentary dispositions, "wills in disguise?"

We think it would be extremely difficult, upon the evidence contained in the record before us, so to pronounce. The donor was in health at the time, and so continued for several years after these dispositions, during which time she spoke of having disposed of her property. Possession of the negroes conveyed to the defendant, Elliott, who did not reside at the same place with the donor, was actually delivered; they went into his possession, the witnesses say. The possession of all the other property was consistent with the deeds. The defendant, John, lived with the donor, and had control of the property conveyed to him. There was no retention of the possession by the donor, inconsistent with the absolute and complete disposition of the property, which the deeds import. There is nothing in the evidence tending in the slightest degree to show, that the donor did not part presently with her entire control and dominion over the property conveyed.

There is no single circumstance disclosed by the evidence, conducing to the conclusion that she retained, or intended to retain, the power of disposition, or any control over the property, or that she ever asserted any claim to it, after the making of the deeds. On the contrary, she spoke of having disposed of it;

and so far as the record discloses, she appears to have divested herself of the ownership, thereby, in fact, making the donee richer and herself poorer, during the remainder of her life.

There is nothing in the nature of the transaction itself, to induce the belief that it was not, in fact, what it purports upon its face; an absolute disposition of the property. The donor was advanced in years; was living with her son, one of the donees, who, ever after the death of his father, had continued to reside with her, and to provide for her wants, and to perform the part of an affectionate and dutiful son; he had been her reliance and support in her old age, and the instrument of preserving and accumulating the property. To whom was it so natural that she should give it? It was not unnatural that she should make him the principal object of her bounty, or that she should bestow it upon those who had well performed the part of dutiful and affectionate children, rather than upon others who had not performed a like part towards her. Nor was it unnatural that she should wish to divest herself of the property. Her personal wants were provided for; she did not have need of the property, and could not take care of it; and there would seem to be no reason why she should desire to retain it.

There is nothing in the disposition which she made of the property, considered in itself, or in the extrinsic evidence in the case, to warrant the conclusion that it was not a present disposition, but a disposition to take effect only after her death, a contrivance to evade the statute of wills. There can be no more than conjecture, for there is no evidence, that her object in making the disposition she did of the property, was to prevent the plaintiffs from inheriting any part of it, in the event of her death. The circumstances supposed to favor such a supposition are, that she, at one time, conceived a prejudice against her son, James D. Millican, under whom the plaintiffs claim as heirs, because he made claim to all the real estate of his father. But this son had died several years before the making of these deeds, and there is no evidence that this prejudice extended to his children or heirs. She had, at one time, spoken of making a

will, and at another of being indebted to her son John, one of the donees. Mere conjecture, founded on circumstances so slight and inconclusive in their nature as these, can scarcely be deemed to warrant the conclusion, that her object in making these dispositions, was to prevent the plaintiffs from inheriting from her the property.

But if it was, and she made an absolute and complete disposition of it, by donation or sale, divesting herself of the ownership, that motive, of itself, would not be a ground for setting aside the conveyance. The property was her's, to dispose of as she saw proper, in her life-time. She could indulge her partiality for a favorite child, and bestow her bounty upon him, to the exclusion of others, if she chose to do so, by an absolute and unqualified gift and surrender of her entire interest, to take effect presently, in her life-time. Such a disposition could not be set aside, as being in fraud of the statute of wills. If she parted with the property, though with the intention of preventing the plaintiffs from inheriting, and because she knew she could not disinherit them by will, still, having the disposing power, the donation, if complete and absolute, would be effectual to vest the property in the donee, as against her, and those claiming under her, as heirs or distributees. It could not be avoided, on the ground that it was a testamentary disposition of the property, or a fraud upon the statute. The deeds in question, importing an absolute transfer of the property, the burden of proving the contrary was on the plaintiffs; and we see nothing in the evidence to warrant the conclusion that they were not made and delivered with the purpose and intention, which appears upon their face, or that they did not have the full effect and operation, to divest the grantor of the ownership, and vest it absolutely and presently in the donees.

This case is wanting in the material facts and circumstances, which in the case of Crain v. Crain, attended the making the instruments there under examination, and induced the determination that they were wills. On the principles maintained in that decision, and the authorities there cited, it must be held, that

the instruments here in question are not wills, but absolute dispositions by deed; and that they are unaffected by the statute of wills, in force at the time of their execution.

The remaining inquiry is, whether the deeds were obtained by undue influence. "In order to avoid a grant, on the ground of undue influence, it must be shown that the influence existed, and was exercised for an undue and disadvantageous purpose. The former point may be inferred from the relative or actual position of the parties; but the latter must be determined by an examination into the nature and results of the transaction, which is called in question. Both these points must concur to produce the effect of avoidance." (Hare & Wallace's note to Huguenin v. Baseley, 2 Lead. Cas. in Eq., part 2, p. 65.

Considering the present, as a transaction between persons not standing in any peculiar or confidential relation, or as sustaining the relation of parent and child, or principal and agent, the doctrine of equity applicable to the case is, that it will not set aside a voluntary deed or donation, however improvident it may be, if it be free from the imputation of fraud, surprise, or undue influence, and made by the donor voluntarily, when not laboring under any deception or mistake of facts. And proof of the fraud, surprise or undue influence, which will avoid the donation, is completely thrown upon the donor, for *primâ facie*, the donation is valid. (2 Lead. Cas. in Eq., part 2, p. 56; 3 My. & K. 113.)

Thus considered, as divested of the relation in which the parties stood, of parent and child, or principal and agent, the present case must be regarded as wholly free from difficulty or doubt. There is no evidence of any influence of any kind employed by the donees, to procure the making of the deeds. So far as appears, it was the free, voluntary and spontaneous act of the donor; and is wholly free from the suspicion of fraud or undue influence. It is free from doubt, that she was of sound and disposing mind. The evidence represents her as being a person of strong and vigorous intellect, entirely capable of making a legal disposition of her property; a person having a mind of her own,

and who did as she pleased, not being under the influence of any one.

Some of the witnesses say, that she was influenced more by her son, who resided with her, than by any one else. But it is evident, that the influence of which they speak, was not the kind of influence which is meant, when the law speaks of undue influence. It was the influence which a dutiful child may exert over a parent, by acts of filial duty and obedience; the influence which naturally flows from mutual confidence and affection. That is not undue influence; it is not the kind of influence which is used for an undue or injurious purpose. Influence may be proper, or improper. That is proper influence, which one person gains over another, by acts of kindness and attention, and by correct conduct. Improper influence is that dominion acquired by any person, over a mind of sanity for general purposes, and of sufficient soundness and discretion to regulate his affairs in general, which prevents the exercise of his discretion, and destroys his free will. (3 Serg. & Rawle, 269; 1 Cox's Cases, 355.) The influence spoken of by the witnesses, was of the former, not of the latter, description. There is no evidence of any improper or undue influence having been exercised in this case.

Is such influence to be inferred from the relation of parent and child? In the case of a gift from a child to a parent, undue influence may be inferred from the relation itself; but never, where the gift is from the parent to the child. In the former case, it may be inferred that the donation proceeded from the exercise of parental authority; for it is natural that the known wishes of a parent should be felt, by a child accustomed from infancy to implicit confidence and obedience, even after attaining to the period of majority, to have the force of commands. But in the latter case, there is no such inference. The parent is not accustomed to yield obedience to the wishes of the child, further than affection or duty prompts; and it is in accordance with the dictates of the law of nature, respecting the transmission of property, that parents should make donations to their children.

The Supreme Court of the United States, in Jenkins v. Pye, 12 Peters, 241, deny that the relation of parent and child is sufficient, of itself, to set aside a deed, even from a child to a parent, on the ground of undue influence. The court said: "The first ground of objection, seeks to establish the broad principle, that a deed from a child to a parent, conveying the real estate of the child, ought, upon considerations of public policy, growing out of the relation of the parties, to be deemed void; and numerous cases in the English chancery have been referred to, which are supposed to establish this principle. We do not deem it necessary to travel over all these authorities; we have looked into the leading cases, and cannot discover anything to warrant the broad and unqualified doctrine contended for on the part of the appellees. All the cases are accompanied with some ingredient, showing undue influence exercised by the parent, operating on the fears or hopes of the child, and sufficient to show reasonable grounds to presume that the act was not perfectly free and voluntary on the part of the child; and in some cases, although there may be circumstances tending, in some small degree, to show undue influence; yet if the agreement appears reasonable, it has been considered enough to outweigh light circumstances, so as not to affect the validity of the deed. It becomes the less necessary for us to go into a critical examination of the English chancery doctrine on this subject, for should the cases be found to countenance it, we should not be disposed to adopt the broad principle contended for, that a deed of a child to a parent is to be deemed, *primâ facie*, void. It is undoubtedly the duty of courts carefully to watch and examine the circumstances attending transactions of this kind, when brought under review before them, to discover if any undue influence has been exercised in obtaining the conveyance. But to consider a parent disqualified to take a voluntary deed from his child, without consideration, on account of their relationship, is assuming a principle at war with all filial as well as parental duty and affection; and acting on the presumption that a parent, instead of wishing to promote the interest and welfare, would

be seeking to overreach and defraud his child." (12 Peters, 253.) Judge STORY has incorporated copious extracts from this opinion, into his commentaries on equity jurisprudence. (1 Story, Eq., § 309, n.)

But however, and with whatever degree of suspicion a court of equity will regard a voluntary conveyance by a child to a parent, it is well settled, that no suspicion whatever attaches, in the view of the court, to such a conveyance by a parent to a child. This point was fully considered and authoritatively determined by this court, in the case of Saufley v. Jackson, (16 Texas Rep. 579,) where the authorities are reviewed, and the whole subject is examined in one of the ablest opinions of the late lamented Judge LIPSCOMB.

There is no doubt, that a gift or grant, from a parent to a child, may be set aside upon proof of fraud, surprise, or undue influence actually exercised by the latter over the former, to obtain the gift or conveyance. But that is not this case; and the only case of that kind, which has been brought to our attention, and especially relied on by counsel for the appellants, (doubtless there may be others, see Hare & Wallace's note to Huguenin v. Baseley, 2 Lead. Cas. in Eq.,) is the case of Whelan v. Whelan, 3 Cowen, 537. In that case, a man far advanced in years, and somewhat impaired in intellect, though not absolutely imbecile, but very credulous, and easily persuaded by those whom he believed his friends, and who could be persuaded to do any act dictated to him, when apprehensive that his property was in danger, had separated from his wife and family, with the exception of two of his sons, to whom he entrusted the care of his farm. Legal proceedings were instituted by his wife, for the purpose of obtaining a separate maintenance, which caused him to form the erroneous impression, which was confirmed by the language of one of his sons, that his whole estate would be taken for the payment of his debts. His alarm finally became so great, that he executed a conveyance of all his estate to the son who had confirmed the apprehension he had of losing his property, in trust for himself and his brother. These circum-

stances, with others, adverted to by the court, were held to show such a case of influence, unduly and injuriously exercised, as to warrant a decree avoiding the conveyance.

Upon this case, after stating that the doctrine that a deed or gift, by a child to a parent, will be deemed *primâ facie* void, if it ever obtained in England, has been modified in that country, and has not been adopted in this; and that it was never applied to a deed or gift, by a parent to a child, Mr. Justice LIPS-COMB, in Saufley v. Jackson, (*supra*,) remarks, that the case of Whelan v. Whelan, is not an exception to this last observation. "In that case," he says, "fraud, gross and palpable, was practised by a son, and false and fraudulent representations were made by him to his father, for the purpose of procuring the deed; so much so, that it would have invalidated the deed, if the parties had been strangers, and contracted at arm's length with each other." (16 Texas Rep. 584, 585.)

Unquestionably, the case of Whelan v. Whelan, was decided upon clear proof of actual fraud practised, and undue influence obtained and exercised, in obtaining the conveyance, and not upon the ground of undue influence inferred from the relation of parent and child. It bears no analogy to the present case, and is not an authority for avoiding the deeds in question, on account of the relation of the parties. The only circumstance of similarity in the cases, as respects the present inquiry concerning the relation of the parties as parent and child, is, that the donor was advanced in years. But here there is no evidence of mental imbecility or weakness; but the evidence is quite to the contrary.

Old age alone, is not a ground for presuming imposition or undue influence. "We have seen the greatest abilities displayed at a greater age than seventy-five," (said Mr. Justice BULLER, in Lewis v. Pead, referring to Lord MANSFIELD, who had left the bench only the year before, at the age of eighty-four,) "therefore that alone can be no ground to presume imposition." (Lewis v. Pead, 1 Ves., Jr., Sumner's edit. 19, 20, note.) It is a circumstance which may be taken into consideration in esti-

mating the fairness of a transaction, where there is evidence conducing to show imposition. But here there is no such evidence.

The principal witness, who speaks directly to the question of the mental capacity of the donor, who appears to have had the best opportunities for knowing, and who testifies with remarkable clearness and distinctness, (Mrs. Rector) speaking to that question, says, she was neither of a credulous, nor of a suspicious disposition. Two of the witnesses, thought her rather of a suspicious, than of a credulous disposition. But their testimony shows, that what they meant by that expression, was, that she was a person who kept her own counsels; she was not accustomed to speak of her pecuniary affairs, or her property. All agree in representing her, as very far from being imbecile or weak-minded.

As to the defendant, Elliott, there is no evidence of his having had any influence over the donor whatever, though she made him one of the objects of her bounty. Whatever influence the other defendant may have had, is shown to have been the effect of his kindness, and general good and commendable conduct, towards his widowed and aged mother. It was a proper, not an undue influence. There is no evidence, that there was ever any abuse of the confidence she may have reposed in him. It is not the mere fact of confidence reposed, but the abuse of it, that will give occasion for courts of justice to interfere. In fine, the imputation of undue influence, exercised by the defendants in obtaining the deeds, is wholly unsupported by evidence; and to avoid the deeds on this ground, would be to maintain, that such influence is a legal inference from the relation of the parties, and to establish the broad principle, that a voluntary conveyance by a parent to a child, is *primâ facie* void; a principle which would be violative of all parental, as well as filial duty and affection. The case of Saufley v. Jackson, is decisive of this question, and fully establishes, that undue influence is not to be inferred in such a case as this, from the relation of the parties as parent and child.

Will it be inferred from the relation of principal and agent, as it is shown to have existed between the parties to these deeds? On this point, the proof is, that one of the defendants, (as respects the other, no agency is shown,) attended to the transaction of the business of the donor, as administratrix of the estate of her deceased husband, in the Probate Court, and had the superintendence of her out of door affairs generally. Considering the relation of the parties, this can scarcely be thought a case of agency, of a character which awakens the jealous scrutiny of a court of equity, into the dealings of the parties. (1 Story, Eq. §§ 315, 316, a.) But if it be deemed an agency, in which the law will subject the dealings of the parties to the severest scrutiny, there is nothing in the evidence in the case, to cast the slightest suspicion upon its fairness, as between the parties; and the inquiry here is as to the fairness of the transaction as between the parties themselves. Nothing appears, to induce the apprehension, that any thing was withheld, or concealed from the donor, respecting the amount, or value of her property, or that she was laboring under any deception, or ignorance, of the true situation, nature, and value of her estate. The defendant, John, had administered upon the estate of another son, to whom she was sole heir. But the administration had been closed, and the relation thereby created had wholly ceased, before the making of the deeds in question. The deeds themselves furnish evidence, that she was aware of the estate she had to convey, unless she was ignorant of their contents, which cannot be presumed; and the evidence shows, that she was aware that she had parted with her property.

There is nothing in the evidence, to excite a suspicion, that the making of the deeds, was not the spontaneous exercise of her own voluntary free will, with a perfect understanding of what she was doing, or that she did not freely exercise her undisputed dominion over the property, by disposing of it in the manner she wished, and with which she was then, and ever after, content. Subjected to the severest scrutiny, there is nothing in this case,

to induce a court of equity to set aside the deeds in question, on account of the relation of the parties, as principal and agent.

The case of Hunter v. Atkins, 3 My. & K. 113, is very much in point upon this branch of the case. In that case, the chancellor (Lord BROUGHAM,) sustained a gift by deed, subject to a power of appointment by the donor, Admiral Hunter, then upwards of ninety years of age, to Alderman Atkins, his confidential agent, who had for many years been in habits of friendship with him, although made without the interposition of a disinterested person; the solicitor who drew the deed being the solicitor of the alderman, who took the benefit by it; the Chancellor being of opinion that the circumstances of the case did not warrant the court in ascribing the making of the deed to undue influence, or influence improperly exercised over a person either of insufficient understanding, or under the control or management of another. Lord BROUGHAM said, " There is no dispute upon the rules which, generally speaking, regulate cases of this description, Mr. Alderman Atkins is either to be regarded in the light of an agent, confidentially entrusted with the management of Admiral Hunter's concerns, a person at least in whom he reposed a very special confidence, or he is not. If he is not to be so regarded, then a deed of gift or other disposition of property in his favor, must stand good, unless some direct fraud were practised upon the maker of it; unless some fraud, either by misrepresentation, or by suppression of facts, misled him, or he was of unsound mind, when the deed was made. If the alderman did stand in a confidential relation towards him, then the party seeking to set aside the deed may not be called upon to show direct fraud, but he must satisfy the court, by the circumstances, that some advantage was taken of the confidental relation in which the alderman stood." The court proceeded to distinguish such a case of agency, from the known relations of guardian and ward, attorney and client, trustee and *cestui que trust*, &c., to which a stricter rule is applied.

It is needless to multiply authorities upon this point. The

agency which existed in this case, was such as every widowed mother, who is under the necessity of administering upon her deceased husband's estate, would be likely to entrust to a son, if she have one competent to transact the business; and it will scarcely be contended, that in every such case, the performance of so reasonable a service and duty on his part, will disqualify the son from receiving a gratuity from his mother, or from becoming the object of her bounty, equally with others, who have not rendered such services. Undue influence is not to be inferred as the legal consequence of such an agency.

We conclude, that there is nothing in the relations of the parties, or the evidence in the case, to authorize a court of equity to decree an avoidance of the deeds in question.

It is insisted, that there was error in admitting parol evidence of the custom which obtained in Austin's colony in the granting of lands, and in admitting the deposition of the witness, Christman. These rulings of the court are wholly immaterial, in the view we have taken of the case, and need not, therefore, be revised. Our decision does not rest in any degree upon the evidence in question. Where a case has been decided by the court without a jury, it is not a ground for reversing the judgment, that the court may have heard evidence which was not legally admissible, if it has had no influence upon the result, and the case was rightly decided upon evidence which was competent and sufficient.

We are of opinion, that there is no error in the judgment, and it is affirmed.

Judgment affirmed.