## DECKER v. KOENIG et al.
### No. 12418.

Court of Civil Appeals of Texas. Fort Worth.
Jan. 24, 1931.

Rehearing Granted in Part Feb. 21, 1931.

Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellant.

Carrigan, King & Surles, of Wichita Falls, W. E. Forgy, of Archer City, and Britain & Cheek, of Wichita Falls, for appellees.

CONNER, C. J.

The appellee Annie Koenig, hereinafter referred to as plaintiff, as independent executrix of the last will and testament of A. F. Decker, deceased, instituted this suit against the appellant, Joe J. Decker, hereinafter referred to as defendant, to set aside the following instruments executed by A. F. Decker, to wit:

"State of Texas, County of Wichita:

"Know all men by these presents:

"That Joe J. Decker and A. F. Decker have made and entered into the following contract and agreement:

"I, Joe J. Decker, do hereby agree to look after and care for A. F. Decker during the

balance of his life, giving him the attention that he needs, in consideration of the said A. F. Decker conveying to me all of his property, both real and personal wherever situated.

"I, A. F. Decker, in consideration of Joe J. Decker having heretofore cared for me in time past and an agreement upon the part of Joe J. Decker to take care of me and care for me for the balance of my life, do hereby agree and do this day transfer, assign and convey unto the said Joe J. Decker all the property which I now own, both real and personal as well as any and all property which I may hereafter own both real and personal wherever situated.

"[Signed]   A. F. Decker
"Joe J. Decker."

"State of Texas, County of Wichita:

"Before me, the undersigned authority, a notary public in and for Wichita County, Texas, on this day personally appeared Joe J. Decker and A. F. Decker, known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

"Given under my hand and seal of office, this the 5th day of August, A. D. 1925.

"[Signed]   J. E. Handy, Notary
Public, Wichita County, Texas."
"[Seal]

"State of Texas, County of Wichita:

"Know All Men By These Presents:

"That whereas, I, A. F. Decker, of the county of Archer and State of Texas, being in good health and of sound and disposing mind and memory did on the 5th day of August, 1925, execute and publish my last will and testament, as attached hereto, (attaching the instrument executed and witnessed before Ida Decker and J. E. Handy) as well as did make and enter into a written contract with Joe J. Decker, wherein he agreed to take care of me the balance of my life. I do this day hereby ratify, confirm and reissue and republish and re-acknowledge the last will and testament heretofore made by me on the 5th day of August, 1925, as well as do hereby reaffirm, affirm and acknowledge the contract made between me and Joe J. Decker on the 5th day of August, 1925.

"[Signed]   A. F. Decker."

Attested as follows:

"Signed, declared and published by A. F. Decker as his last will and testament in the presence of us, the attesting witnesses, who have hereto subscribed our names in the presence of A. F. Decker and each other, at the special instance and request of the said A. F. Decker, this the 24th day of August, A. D. 1925.

"[Signed]   Walter Nelson
"Nannie Tompkins."

The essential allegations of plaintiff's petition are to the effect that at specified dates in the summer of 1925 A. F. Decker executed the instruments in question; that said instruments were procured by undue influence in the following particulars, to wit: That A. F. Decker was of advanced age at the time, being about 80 years old, and was in ill health both physically and mentally, and, on account of his age and physical and mental condition, said A. F. Decker, "while not being of unsound mind," was unable to thoroughly understand the terms and effect of said instruments. That the defendant was the nephew of said A. F. Decker, in whom A. F. Decker had implicit confidence and to whom he looked to advise him as to the disposition and handling of his property, and with whom he was living at the time of the execution of said instruments.

It is further alleged that, on account of the age of the deceased and of his mental and physical condition, he was "easily led and persuaded to do that suggested by any one else, and particularly could the defendant lead him and persuade him to do whatever he desired on account of the implicit confidence imposed in him by said deceased." That at the time of the execution of said instruments it was apparent to the defendant that on account of the age and physical and mental infirmity of A. F. Decker that he could not live more than two or three years at the most. That the instrument first executed by A. F. Decker, which was on or about the 5th day of August, 1925, purported to convey to the defendant a described tract of land consisting of about 120 acres which was owned by Decker and which was of the reasonable market value of $6,000; that the only consideration paid by defendant for said land "was the promise upon his part and the agreement set out in said instrument to look after and care for A. F. Decker during the balance of his life, giving him the attention that he needs"; and the further consideration stated in said instruments that defendant "having heretofore cared for me in time past and the agreement on the part of Joe J. Decker to take care of me and care for me the balance of my life."

It was further alleged that said consideration was grossly inadequate, for the reason that the defendant knew that in all probability A. F. Decker would die in two or three years, and that the cost of supporting and maintaining him would not exceed the sum of $100 a year. It was further alleged that A. F. Decker was induced to sign such instruments by such importunate undue influence and compulsion on the part of defendant as to overcome the volition and desire of A. F. Decker.

The defendant, in addition to the general denial, pleaded specially to the effect that the instrument dated August 5, 1925, had been

executed by A. F. Decker at his own suggestion and without any solicitation on the part of defendant; that A. F. Decker was a bachelor, without wife or children; that they lived on adjacent farms during the entire life of Joe Decker, 35 years; that the farm upon which A. F. Decker lived and which he conveyed was worth about $35 an acre; that during the winter preceding the date of August 5, 1925, A. F. Decker had spent the entire time at the home of defendant, where defendant and his wife took good care of him, were kind and considerate towards him, and did not charge him board, room rent, or other expenses, and provided for him all his needs; that during a part of the winter of 1923 A. F. Decker stayed at the home of defendant under the same circumstances; that defendant was a nephew of A. F. Decker, and for him A. F. Decker showed fondness and preference among all of his relatives and friends; that the house in which A. F. Decker lived was in bad repair and unfit for occupancy during cold weather; that no one lived with him to cook for him, keep house, and help keep the fires going and do the many things that were necessary to make him comfortable, and furnish him the necessities of life as well as companionship; that defendant had aided and assisted A. F. Decker throughout his entire life, and that A. F. Decker himself made the suggestion that culminated in the execution of the instruments in controversy, stating that he was not able to support himself, and that he needed care and attention and companionship, and did not desire to live alone, and that he appreciated the kindness shown him by defendant and his wife and the friendly feeling and affection that existed between them.

Defendant further alleged that at the time the contract and deed were made A. F. Decker was of sound mind and thoroughly understood and appreciated the nature and effect of said instruments, and defendant denied that he exercised any undue influence over or took any advantage whatsoever of said A. F. Decker, and further denied that the contract and deed had been given for an inadequate consideration, or that he (defendant) had any reason to believe that A. F. Decker would live only two or three years. It was alleged that A. F. Decker was not sick at the time; that he was but 75 years old, had a life expectancy of more than 6 years, and defendant knew at the time he made the contract that he was assuming a responsibility of care, support, and attention which, would be required both from the defendant and his wife, for the balance of A. F. Decker's life, and was further assuming all medical fees, hospital care, and nursing that might be expected to follow during the latter portion of A. F. Decker's life, together with such funeral expenses as might be expected; that defendant further realized that the length of time that A. F. Decker would live was uncertain and speculative, and for this reason the contract might become burdensome, and that he might be required to pay in services and expenses an amount in excess of the value of said land and the property given him; that the services to be rendered by the defendant and his wife, with the funds necessary for said support, care, and attention, would amount to more than $600 a year; that considering the value of the land, together with some $500 of funds belonging to A. F. Decker in bank, which was later appropriated by plaintiff, the consideration for the deed was adequate. Defendant further alleged that he had since the making of said contract performed and stood ready to perform all obligations assumed by him in the contract referred to.

At the conclusion of the evidence the defendant requested a peremptory instruction which the court refused, but gave a definition of the term "undue influence," to which no exception was taken, and submitted the case to the jury upon special issues, which, together with the answers thereto, are as follows, to wit:

"1. Bearing in mind the foregoing definition of undue influence, do you find from a preponderance of the evidence that the deed or contract described in plaintiff's petition was obtained from A. F. Decker as a result of undue influence exercised by the defendant? Answer: Yes.

"2. Do you find from a preponderance of the evidence that at the time of the signing of the instrument in question defendant intended to carry out the promises made therein to look after and care for A. F. Decker during the balance of his life, and give him the attention needed? Answer: Yes.

"3. Do you find from a preponderance of the evidence that defendant failed and refused to care for and support A. F. Decker and to give him the attention he needed after the date of said deed? Answer: Failed but did not refuse.

"4. Do you find from a preponderance of the evidence that A. F. Decker, at the time of signing the instrument in controversy, believed said promises of defendant were made in good faith, and relied thereon in signing same? Answer: Yes.

"5. Bearing in mind the definition of undue influence above given you, do you find from a preponderance of the evidence that the ratification dated August 24, 1925, executed by A. F. Decker was obtained from the said A. F. Decker as a result of undue influence exercised by the defendant? Answer: Yes.

"6. Do you find from a preponderance of the evidence that during the time A. F. Decker lived with the defendant after August 5, 1925, and accepted the benefits under his con-

tract with said defendant, if he did so, that he was throughout said time under undue influence exercised over him by defendant as the term undue influence has been herein defined? Answer: Yes."

Upon the verdict so rendered, the court entered a judgment canceling the instruments dated August 5, 1925, and August 24, 1925, copied in the beginning of this opinion, and awarded the plaintiff in her capacity as independent executrix the 120 acres of land, but awarded the defendant, Joe J. Decker, the sum of $950 under a cross-plea that had been filed by said defendant to reimburse him for his expenses and services in caring for A. F. Decker, to secure which a lien was fixed on the 120 acres of land in controversy.

To the judgment so rendered the defendant duly excepted and further objected to the action of the court in overruling his motion for a new trial, gave notice of appeal, and has duly prosecuted the same to this court.

The ground upon which the defendant requested the peremptory instruction, urged in his motion for new trial, and presented by his assignments of error in this court, is that the evidence did not warrant the submission of the issues to the jury, the rendition of the judgment, or the action of the court in overruling the motion for new trial.

The evidence as presented in the briefs of the parties and in the statement of facts, duly agreed to and approved by the court, is too lengthy to set out in extenso, but its substance, we think, is sufficiently given as follows:

A. F. Decker owned a little farm of 120 acres in the northern part of Archer county, upon which he lived for many years. He was a bachelor without children, his nearest kin, so far as shown by the evidence, being a sister, the plaintiff Mrs. Koenig, a brother, William Decker, living in one of the northwestern states, and the defendant, Joe Decker, a nephew. A. F. Decker's house, in which he lived, was in bad repair and uncomfortable, especially during cold and bad weather. In 1923 or 1924, he then being about 76 years old, A. F. Decker suffered a paralytic stroke, of a severity not shown by the evidence, after which he became more feeble and thereafter lived with and was cared for by his nephew, Joe Decker, for the most part, especially during the winter months and bad weather, and occasionally with his sister, Mrs. Koenig. The farms of Joe and his uncle joined, and Joe, whenever called upon, aided his uncle for many years, and his uncle, A. F. Decker, manifested full confidence in Joe. The evidence shows that A. F. Decker was a hearty eater, worked in his garden, received and read his mail, conversed with neighbors and others, journeyed to Archer City, Wichita Falls, etc., and wholly fails to show any physical ailment, sickness, disease, or weakness other than such as may be attributed to advanced age and possibly to a mental disturbance to be now mentioned. The evidence shows that from time to time after the paralytic stroke A. F. Decker entertained delusions of mind of various kinds. For instance, the first one noted in the evidence was his insistence that a cloth hung on a line was a woman that he desired a neighbor that he called upon to remove. He laughed when shown his error, but otherwise seemed physically as usual. On the same occasion he insisted that a number of policemen had been coming to his place for several days and he wanted to go to Archer City and get the sheriff to remove them. His neighbor went with him to Archer City, and after consultation with the sheriff, county judge, a doctor, and perhaps others, it was suggested that a guardian ought to be appointed. When the suggestion was mentioned to Decker, and he was asked who he wanted as his guardian, he replied, "Joe." On another occasion he wanted a sister of charity driven away that he insisted visited him in the night but merely stood and said nothing; on another, he saw "magets" in a bunch of bushes, and saw them on his arm. Again he came to the home of his sister, Mrs. Koenig, one night from Joe's and said Joe had tried to kill him, and that he had crawled out of the window to get away. These occurrences were only occasional; at other times his conversations and actions were as usual, normal, and gave the impression that he understood what was said and done. The aberration of mind referred to, however, caused some of the witnesses to think and testify that in their opinion Decker was wholly without a disposing mind.

Several weeks after the 5th of August, 1925, to wit, on the 18th of August, 1925, a lunacy hearing, on the initiation of Mrs. Koenig, was held in Archer City. On the trial Mrs. Koenig, A. F. Decker, himself, and the witnesses, who, on the trial of the case under consideration, related the above instances of mental abnormalities, all testified, and Decker was acquitted of insanity. Along about this time, either before or after, there was talk of oil prospects in the section, and Mrs. Koenig made an effort to get Joe to surrender his contract with Decker and have the farm sold to some offering purchasers for $60 per acre. Decker objected to a sale of the land, and Joe promised him it should not be sold. On August 24, 1925, Joe and A. F. Decker went to Wichita Falls, and A. F. Decker there executed the confirmation instrument copied in the beginning of this opinion, Decker at the same time also executing a last will and testament, revoking all wills theretofore made. In September, 1926, Decker executed a further will in which he devised all property of which he should die seized to his heirs as provided in the statutes of de-

scent and distribution. Mrs. Koenig had the will duly probated and is claiming thereunder by virtue thereof. Certainly Mrs. Koenig is in no position in this suit to claim that A. F. Decker was not of sound and disposing mind when he executed the will under which she claims.

We are thus brought to a consideration of the evidence more particularly relating to the execution of the several instruments attacked in this case.

A. M. Mahler testified, among other things, that he saw A. F. Decker frequently during 1924 and 1925; that at times he would talk "all right"; that he seemed worse after his paralytic stroke; that Joe helped Decker every year that he was over there to thresh; that "I knew Mr. Decker real well, and at times he was perfectly rational."

Dr. Walker testified that he was a graduate physician; knew Mr. Boone, a lawyer, and Mr. Decker, "well for about 30 to 35 years"; that on the 5th day of August, 1925, he was called to examine Mr. Decker and talked with him "in order to determine whether his mental condition was such that he would be capable of making a will; that it was his opinion that he was sane and competent of transacting business." Cross-examined, the witness said that both Mr. Decker and Mr. Boone told him the kind of business he was going to transact; that Decker "talked intelligently about the things he discussed with the witness."

Mr. Boone testified that he had been a practicing lawyer in Wichita Falls for about 20 years; that he prepared the contract of date August 5, 1925, between Joe Decker and A. F. Decker; that he had known A. F. Decker since about 1910; that he also prepared a will for him on the same date; that "from my knowledge and acquaintance with Mr. Decker and from my conversation with him pertaining to the instruments I was called upon to prepare for him, I believed him to be capable of understanding and appreciating the nature of the transactions on the date I prepared these instruments * * * even though he was peculiar, I still say he was capable of understanding what he was doing. I asked him who his family physician was and he told me Dr. Walker, and I told him it was my habit to have a man of his age examined by his family physician prior to writing a will, and I sent him to Dr. Walker and asked him to have Dr. Walker report to me before I drew these instruments. Dr. Walker reported to me and those instruments were then drawn. Those instruments were read over and apparently understood by Mr. Decker before he executed them * * * they were read over to Mr. Decker before he signed them in my office." Mr. Boone further testified that some time later he was employed by

Mr. Decker to represent him in some insanity proceedings in Archer county; that Mr. Decker testified at that trial and that the jury had an opportunity to observe and see him at that time; Mrs. Koenig and three others testified about something he did and said, and Drs. McCurdy and Walker also testified; that Joe Decker brought A. F. Decker to his office on the occasion mentioned; that Mr. Decker had told the witness that "ever since Joe's father had died that Joe had looked after him and cared for him and aided him at all times."

J. E. Handy testified that he was a practicing attorney of Wichita Falls; that "I witnessed the will and contract of A. F. Decker of August 5, 1925, and took his acknowledgment thereto; those instruments were read over to Mr. A. F. Decker. From my observation of Mr. Decker at that time; I saw nothing to indicate that he did not understand those instruments."

Walter Nelson, Sr., testified that he was a practicing attorney at Wichita Falls for more than 16 years; that he did not have a distinct recollection of the transaction relating to the instrument dated August 24, 1925, which he signed as a witness, but that "there was nothing in the appearance and conduct of Mr. A. F. Decker that would leave any impression upon my mind * * * there was nothing in Mr. Decker's conversation and conduct that he lacked the capacity to understand and appreciate the business transaction. If there had been anything out of the ordinary, I would have been attracted by it." Other testimony relating to the execution of the confirmation instrument of August 24, 1925, was of like import.

The will written by Mr. Boone and executed by Decker in Joe's favor was never probated, presumably because of its revocation in the will later executed in favor of Mrs. Koenig. Mr. Boone did not recall the reason the will in favor of Joe had been prepared. It may be inferred, however, that it was in order to cover property not in esse at the time but which might be later acquired by Decker and owned by him at the time of his death.

It may be further stated that the moneys in the bank owned by Decker at the time of the execution of the contract of August 5, 1925, were later drawn out by Mrs. Koenig. The evidence also shows that Joe put in the crop of 1926, which, when harvested, was sold and the check therefor taken by Mrs. Koenig. That in September, 1926, A. F. Decker was sent to the hospital. Joe paid in hospital fees $260, and when A. F. Decker died in the hospital in the latter part of December, 1927, Joe arranged for his burial expenses and has ever been ready and willing to pay the same if called upon to do so, but that Mrs. Koenig

intervened, made other arrangements, and buried him.

As relating to plaintiff's plea of a want of consideration, it should be noted that, aside from the hospital fees paid, the evidence fails to show the value of Joe's services, for which his uncle expressed a willingness to pay, and which must have been considerable, for by agreement of all parties the court awarded Joe $950. Then, too, in the very nature of the case, the time of Decker's death could not be foretold with any certainty. The evidence fails to show that he had any disease or sickness at the time of entering into the contract other than mental. Indeed, the evidence fails to show the immediate cause of his death. No expert testified to his life expectancy, and the opinion of the witnesses that the land was worth $60 an acre must be considered in the light of the suggestion of oil in the section and of testimony of at least one witness that at the time of the trial it was worth about $25 or $35.

In the case of Freeman v. Jones, 43 Tex. Civ. App. 332, 94 S. W. 1072, it is said, quoting from the headnote, that: "A conveyance in consideration of the grantee undertaking to pay the taxes and keep the premises in repair and to support the grantor, the expense of which may equal the value of the property on her living out her expectancy, is supported by a sufficient consideration."

The principle thus stated is familiar and need not be fortified by the citation of additional authorities.

■ The right of persons competent to contract to dispose of property belonging to them as they wish, when not in violation of the law, has been long upheld. For instance, in the case of Smith v. Doak, 3 Tex. 215, it was said by our Supreme Court that: "To deny to parties capable of contracting, the power and right to make their own contracts, would be for the courts to assume the guardianship of adults as well as of infants"—citing Chief Justice Marshall in 2 Peters' U. S. Cond. 481.

Nevertheless, contracts, conveyances, and wills may be set aside when induced by "undue influence." In such cases the general rule in truth is not violated, but it has been made to appear that the wish or free will of the contracting party as a necessary element of all contracts has not been established as expressed in the contract, but, on the contrary, has been overcome or destroyed by undue influence, with result, as the court declares, that no contract has been created or entered into.

■ In the case under consideration, it is to be noted that it is not alleged that at the time of execution of the instruments in writing in question A. F. Decker was insane or wholly without power to exercise his will. That issue was and is not now presented in the pleadings of the parties, and hence the instrument cannot be annulled on that ground. The only attack made is that the defendant unduly influenced A. F. Decker to act.

■■ "Undue influence," legally speaking, must be such as in some measure destroys the free agency of the testator. It must be sufficient to prevent the exercise of that discretion which the law requires in relation to every testamentary disposition. Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98; McIntosh v. Moore, 22 Tex. Civ. App. 22, 53 S. W. 611; Morrison v. Thoman, 99 Tex. 248, 89 S. W. 409.

■ No matter how great the fraud may have been nor how vigorous and active the influence produced upon and exerted over the testator, they would not avail to set aside the will unless they were sufficient to overcome the volition and desire of the testator. Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98; Barry v. Graciette (Tex. Civ. App.) 71 S. W. 309; Wetz v. Schneider, 34 Tex. Civ. App. 201, 78 S. W. 394.

■ Difference in the mental capacity of the parties to a contract is not ground for rescission, unless one overreached the other through his superior capacity. Moore v. Cross, 87 Tex. 557, 29 S. W. 1051. The fact that a testator was under the general and even the controlling influence of another person in the conduct of his affairs will not suffice to invalidate the will unless that influence was specially exerted upon the testamentary act. Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98. "Undue influence" implies that the influence is in a sense improper and wrongful. Morrison v. Thoman (Tex. Civ. App.) 86 S. W. 1069.

Not every influence brought to bear upon the mind of a testator by a beneficiary will be classed as undue influence. Persuasion, entreaty, cajolery, importunity, argument, intercession, and solicitation are permissible, and cannot be held to be undue influence unless they subverted and overthrew the will of the testator and caused him to do a thing that he did not desire to do. Wetz v. Schneider, 34 Tex. Civ. App. 201, 78 S. W. 394; Robinson v. Stuart, 73 Tex. 267, 11 S. W. 275; Morrison v. Thoman, (Tex. Civ. App.) 86 S. W. 1069, and other cases there cited.

That is proper influence, which one person gains over another, by acts of kindness and attention, and by correct conduct. Millican v. Millican, 24 Tex. 426; Trezevant v. Rains (Tex. Sup.) 19 S. W. 567.

It is the rule that "a will, solely the result of kindness and good nature, showing themselves in acts of attention and services on

the part of the beneficiary towards the testator in caring for him or in attending to his needs in sickness or in health, is not procured by undue influence." Barry v. Graciette (Tex. Civ. App.) 71 S. W. 309.

In Millican v. Millican, 24 Tex. 426, it is held that the influence that the dutiful child may exercise over an aged parent by acts of filial duty, and which naturally flows from mutual confidence and affection, is not improper, and will not invalidate a deed from the parent to the child.

■ Again it is the rule that the burden of proving that undue influence operated upon the will in question lies on the party who alleges it. Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98. To the same effect is the case of Hart v. Hart (Tex. Civ. App.) 110 S. W. 91. And in Trezevant v. Rains (Tex. Sup.) 19 S. W. 567, it is said that it is not enough to establish undue influence to show interest and opportunity. To the same effect is Barry v. Graciette (Tex. Civ. App.) 71 S. W. 309.

In Delgado v. Gonzales (Tex. Civ. App.) 28 S. W. 459, it is said that the mere presence of the chief beneficiary under a will at the time the will was signed is not evidence of undue influence. Again it is held that the probate of a will should not be set aside on mere suspicion of undue influence, or on a showing that opportunity to exercise such influence may have existed. Brown v. Mitchell, 75 Tex. 9, 12 S. W. 606; Trezevant v. Rains (Tex. Sup.) 19 S. W. 567.

While the natural impulse of the normal man is to bestow his final benefactions upon the person and in the order pointed out in our statutes of descent and distribution, yet this impulse or trend of mind must give way to the undoubted legal right to otherwise dispose of his possessions.

It is to be noted that A. F. Decker, of all persons, best knew his relatives, knew best those who had been most thoughtful, kind, and helpful, and who of all his kinsmen he could most confidently rely upon for the care, comfort, and support, of which he stood in need. The right to provide for such benefits during our lonely and helpless years is thus expressed by Chief Justice Fly in the case of Salinas v. Garcia (Tex. Civ. App.) 135 S. W. 588, 591: "It is indeed a sad commentary upon humanity that when filial love has failed, and gratitude and devotion have passed away, the fear and awe inspired by the power of testamentary disposition of property becomes the 'shadow of a rock in a weary land,' and will insure the greatest respect and most devoted attention. Except in extreme cases of imbecility, the aged and decrepit should not be deprived of this last defense against ingratitude and base neglect."

We find no evidence whatever tending to show that Joe Decker, by word or act, sought to induce his uncle to execute the instruments in controversy. Nor does it appear that A. F. Decker was at all times wanting in will power. It will be remembered that he manifested his will in opposing the sale of the farm when Mrs. Koenig and Will Decker sought to have it sold. Mr. Thelbert Martin, the lawyer in Wichita Falls who prepared the will under which Mrs. Koenig is claiming, testified that A. F. Decker and Mrs. Koenig came to his office together, and that at Mrs. Koenig's suggestion he prepared the will which expressed the desire that after the payment of all debts, etc., "his estate," without designating the farm or any other property particularly, should go to his heirs as provided in our statutes of descent and distribution. On cross-examination he testified: "Yes, he (Mr. Decker) talked rationally but did not talk very much. Mrs. Koenig did most of the talking. She explained the will clearly about what she wanted done, but Mr. Decker did not agree with her. He would not do what she wanted him to do. She wanted him to make a will giving her all of the property. She suggested to me that the will be drawn that way but Mr. Decker objected; she said he ought to give it to her because she had been good to him. * * * When they came in the first day she did all of the talking. As I remember her statement she wanted to do away with these papers he had executed before, and will all of the property to her. He would not leave it to her. He just told me that he wanted all of his legal heirs to participate in his estate. He told me he had a small farm out there, and that was about all he had left. In resisting Mrs. Koenig's efforts to have him will her all of his property, he was firm in his stand. I would take it that he exercised pretty strong will in resisting her. He was firm in his reply that he would not give it to her. There was not much argument about it. In talking with me he impressed me as being able to make disposition of his property. It appeared to me that he was fully competent mentally to dispose of his property."

■ A careful consideration of the evidence in the light of the authorities has led us to the conclusion that the plaintiff wholly failed to support the case presented in her petition or the verdict and judgment in her favor. We accordingly are of the opinion that the verdict and judgment should be set aside, and it is ordered that the judgments below be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

### On Motion for Rehearing.

We have endeavored to give appellee's motion for rehearing as careful consideration as

we have been able to give it, but retain the views and final conclusion expressed in our opinion herein filed on January 24, 1931.

The following is said in concluding the motion, to wit:

"We respectfully suggest that if this court adheres to its former ruling on this question that it render judgment in this court rather than remanding it for a new trial. We say this because we do not know of any further testimony that could be adduced in another trial, and it would be useless expenditure of time and expense for both the attorneys and the parties to try the case again in the trial court.

"Wherefore, appellee respectfully prays that the former judgment heretofore entered by this court be set aside, and that judgment be entered affirming that of the trial court, and that in the alternative, the judgment of the trial court be rendered rather than remanded for a new trial."

Appellant, in a motion therefor, also prays that the judgment be here rendered for appellant. It is accordingly ordered that the judgment heretofore rendered in this cause remanding the case to the trial court be set aside and judgment be now and here rendered setting aside the money judgment of $950 in appellant's favor under his alternative pleading, but vesting in him affirmatively full title and right of possession in and to the tract of land described in the pleadings of the parties, together with all costs of suit in the court below, as well as on appeal, for all of which appropriate process may issue.

BUCK, J., not sitting on rehearing.