## PIERSON v. PIERSON et al.
### No. 9807.

Court of Civil Appeals of Texas. Galveston.
Jan. 25, 1933.

Rehearing Denied Feb. 16, 1933.

Morris D. Meyer, of Houston, and Lockhart, Hughes & Lockhart, of Galveston, for appellant.

D. J. Wilson, of Galveston, and W. J. Walden, Chas. W. Bell, and Rodman S. Cosby, all of Houston (Bryan, Cosby, Suhr & Bering, of Houston, of counsel), for appellees.

GRAVES, Justice.

This appeal is from a judgment refusing the probate of the will of Andrew L. Pierson, Sr., dated December 6, 1923, as well as the codicil thereto of date May 24, 1928, entered upon a jury's findings to 'the effect that, while these two documents were legally executed and witnessed and no subsequent nor different will was ever made by Andrew L. Pierson, Sr., both this will and its codicil were the result of undue influence exercised upon Andrew L. Pierson, Sr., by Andrew L. Pierson, Jr.

Appellant challenges such determination below upon the ground that the evidence was not even sufficient to raise an issue for the jury over whether or not this will and codicil had been the result of any such alleged undue influence, wherefore his request for a peremptory instruction in his favor on that account should have been granted, and since that was not done, for the same reason the verdict so returned should have been set aside and a new trial granted him.

In this court, sufficient support for so much of the verdict as found that the will and codicil in issue had been duly executed with the formalities and solemnities required by law is in effect conceded by both sides, hence the controversy here is reduced to one solely of whether or not there was enough evidence to sustain the contest thereof.

■ After a painstaking consideration of the statement of facts, this court 'sustains appellant's contention that the evidence was insufficient to raise an issue for the jury over whether or not any such influence had been exercised, and that in consequence the trial court should have so withdrawn the cause from the jury and entered judgment in appellant's favor requiring the probate of the will.

■ This conclusion, in the main, is based upon these considerations: When once the right in law of a testator when in sound mind and acting of his own free will and accord to dispose of his property as he chooses is recognized, there appears upon the face of this will at least nothing inherently unnatural nor unjust. Its provisions in substance were these:

After a recitation to the effect that he had made a settlement with his sons, Henry, Walter, and Randolph Pierson with reference to their interests in the estate of their mother, and directing that, if all of them had not sooner received in full the amounts thereof, they should be first so paid out of the proceeds of the sale of the real estate standing in his name at the time of his death, bequests were made out of the proceeds to arise from the sale of his own remaining 7/10 interest therein as follows:

To the Masonic Orphans' Home at Fort Worth 67 shares of Masonic stock; to his oldest son, Andrew L. Pierson, Jr., appellant, all stock the father owned in the A. L. Pierson Manufacturing Company; to Josephine Murney and John Earls, $3,000 each; to Ruth Vautrin, afterwards Mrs. J. J. Stirling, his niece, $5,000; to Lucile Pierson, $100; to his three sons, Marcus, Henry, and Randolph Pierson, the appellees, or contestants of the will, each $10; $8,000 to the First National Bank of Galveston in trust for his grandson, Marcus A. Pierson, the son of appellee Marcus; then one-half the residue of the property to his son, A. L. Pierson, Jr., in trust for the latter's sons and his own grandsons, A. L. Pierson, 3d, and Lionel Pierson, and the other one-half of the residue to his son, Walter Pierson, with proviso that, if Walter died before the testator did, then the entire residue should go to the two grandsons last mentioned.

The codicil merely changes the will in the respect that it reduces the bequests to Josephine Murney and Ruth Vautrin to $1,000 and $2,000, respectively.

Appellant, A. L. Pierson, Jr., was made independent executor of this will without bond, nor was any bond required of him as administrator of the trust created therein for the benefit of his two minor children.

It thus appears that Mr. Pierson, Sr., had five sons, one of whom, Walter, did not participate in this litigation—he, the testimony indicated, considering that he was not entitled to anything more than the father had just provided for him in the settlements affecting his mother's estate—the contest of the will, therefore, having been prosecuted by the three who only received $10 under its terms against the remaining one, Andrew, Jr., so named as the larger beneficiary and independent executor thereof.

While, unexplained, the cutting down of the three appellee sons to nominal bequests of $10 each might import not only inequality but possibly even injustice on the father's part, there appears undisputedly in the evidence a probable cause for this, in that prior to the time of the execution of the first of these

documents, one of these three, Randolph, had filed a suit in the courts against his father to require him to then pay what Randolph claimed was due him from the estate of his deceased mother; another one of them, Henry, then made a demand on the father for a like settlement for himself, with a threat to also file a suit, if it was not made; during the same time, a strained relationship, brought about by unexplained reasons, was testified to as having existed between the third of these sons, Marcus, and his father.

Witnesses testified that these conditions at that time greatly grieved and worried the elder Pierson; that he was required to raise $8,000 in money to dispose of this suit Randolph had filed; and that, apparently because of it, he also made similar settlements with Henry and Walter of their claimed interests in their mother's estate, by notes or otherwise, which settlements were all three consummated just shortly before the will here involved was executed. One of these witnesses said that the old gentleman, in referring to Randolph's action, was crying about it, and said: "He has knocked the easy chair from under his old Daddy's feet."

Another incident the appellees lay much stress upon is the testimony of Mrs. J. J. Stirling (nee Ruth Vautrin) that, just prior to September 15th of 1929, the elder Pierson said to her: "Ruth, I asked Andrew for my will and he wouldn't give it to me. He said his wife had the key to the strong box in Kerrville, I think, where she was visiting. I said 'Well, Uncle Pierson, that seems strange that she should have such an important key up there with her,' and he said 'That is what I thought, but I wanted my will.'"

She added that the old gentleman had thereafter mentioned that incident again to her on several occasions saying about the same thing, and expressing regret at his inability to get the will, but never telling her why he wanted it.

This is the only mention of or suggestion about a will that could have applied to this one from witnesses for the contestants in the entire record, and even it seems to have been denuded of any possible significance in their favor by this testimony of Mrs. Stirling's father, Mr. P. J. Vautrin, who was old Mr. Pierson's closest friend:

"Q. Did Father Pierson ever discuss with you the fact that he went to Houston to get his will? A. He never said he went to Houston. He said he wanted to get the will, as he was thinking of making the City National Bank executors, as he figured that possibly there would be a controversy, and it would relieve Andrew of some of the trouble that is before this court now. That was his expression.

"Q. Did he indicate that he did or did not get the will? A. He said that he was unable to get it, as it was in the safe deposit box in Houston, the key to which Mrs. Rosina Pierson, the wife of Andrew, had, and she was in a hospital in Kerrville, where she met with an accident, turned over in her car, and he couldn't get it.

"Q. Did Father Pierson indicate to you that he ever made any other efforts to get the will? A. He never did. That was the last of it. I never heard of it any more."

So much upon the specific features referred to.

As concerns the case for the contestants as a whole, despite diligent search, this court finds nothing anywhere in the record that tends with any probative force to show that the appellant had anything at all to do with, or that he in any manner brought about, either the preparation or the execution of this will or of its subsequent codicil. There is not even made out a clear case of an opportunity in him of exercising an undue influence with reference to the making of either instrument. In this instance, unlike many of the cases cited and relied upon by the appellees, the circumstances surrounding this testator and the execution of both these challenged instruments by him are affirmatively and undisputedly shown; they so strongly rebut any legitimate inference that the appellant did exert such an influence at the time as to be controlling; they show that the appellant had permanently moved to Houston from Galveston some ten years before the will was executed, that he was not present then nor at the making of the codicil some six years later, and that he had nothing whatever to do with the preparation or signing of either; the testimony of the attorney who drew both papers for the senior Pierson and who had been his personal attorney for some time prior thereto, makes indisputable and entirely free from any suspicion of their being the result of any other volition than that of old Mr. Pierson himself the fact that the will was prepared in the attorney's office in Houston from information the testator had given him; that the attorney then took it to Galveston for execution by Mr. Pierson and that the latter, fully understanding its contents and approving it as drawn, then went before two of his old friends there, Messrs. Joseph Bonart and Sam Schornstein, and executed it; like procedure also attended the preparation and execution of the later codicil, Mr. Pierson having called upon the same attorney and advised him of his desire to make a change in the will and that it was accordingly drawn up and mailed to Mr. Pierson in Galveston, who received it there and took it before two other friends, Messrs. H. J. Strickhausen and G. H. Scheel, and likewise executed it.

While thus failing to show that appellant had anything to do with the procurement or preparation of either the will itself or the

codicil, the appellees yet contend that the testimony shows an almost complete domination by appellant of his father over a period of many years, including the very time of execution of both the will and the codicil, to the extent that a jury might reasonably infer therefrom that such control did or must have so operated upon his father in the acts of making the will and codicil as to have substituted the volition of the son for that of the father in them; but this at best seems to amount to a claim for the exercise of undue influence at very long range; indeed, the evidence as to the surroundings of the parties during this period, as well as of the character, mentality, and disposition of the father, so strongly rebutted it as to leave it, in our opinion, nothing more than a mere surmise; it was indisputably shown that all of this time the elder Pierson was a man not only of unimpaired mental power but of very strong character and determination; that he was of firm disposition, with definite, fixed opinions of his own, to the extent that he could not be controlled by anything except his own ideas of what was right or wrong; that these qualities of body and mind continued unchanged throughout the six years of his life following the execution of the will, and that during all the period from before the execution of the will until his death he handled all of his real estate business personally, and that during those final years he even conducted a retail-clothing business of his own in Galveston, where he had always resided, not connected with the A. L. Pierson Manufacturing Company of Houston, attending individually also to all details of his banking business, including the personal giving of notes and issuance of checks, thus continuing to the end of his life generally to be, as he had always uninterruptedly before been, the self-reliant, self-opinionated master of all his own affairs.

While, as already indicated, there was not a scintilla of evidence produced tending to indicate any domination of appellant over his father, with relation to the making of this will or codicil, nor that he ever advised or suggested anything about the making of either, or even knew of the contents or existence of them until after they were made, the contestants do adduce a mass of testimony relating to wholly remote and disassociated matters which they claim tended to show the general domination they relied solely upon; but when all these are appraised, it will be found that they had to do, almost exclusively, with proposals to old Mr. Pierson with reference to the expenditure or investment of money, and to all such things he was reported to invariably demur, with the statement that they would have to go to Andrew, or that Andrew would not permit him to do it, or that he would have to see Andrew first.

While on the face of it this showing still leaves a great gulf fixed between it and the kind of control the law requires to overturn a legally executed will, a complete accounting for it, consistent with entirely natural and proper relationships between the two, is otherwise afforded in the evidence, since it uncontrovertedly appeared that Andrew being the oldest son had been trained up by the father through a period of about thirty years in all the details of the major business of his long life—the Pierson Manufacturing Company—with the result that he had come to look to this son for counsel and advice as to all matters pertaining to his business and financial affairs, to the extent that he had put him in charge of that business at Houston, making him vice president and general manager thereof, with the duty of taking care of and handling practically all matters pertaining to it; since the record shows that that son had proven himself worthy of such confidence by the successful management of the business throughout many years, it is difficult to see how it could reasonably be thought unnatural for the father to lean upon and desire his counsel in matters of business generally.

Whatever the refinements it may have otherwise gone through, the phrase "undue influence" has acquired in our jurisprudence, as applicable to the simple question here involved, a well defined legal meaning in these two respects: First, as to what it is; second, as to the quantum of proof required to establish it.

Under the first of these, it has thus been acceptably defined: "To be classed as undue, influence must place the testator in the attitude of saying: 'It is not my will, but I must do it.' He must act under such coercion, compulsion or constraint, that his own free agency is destroyed." Ginter v. Ginter, 79 Kan. 721, 101 P. 634, 22 L. R. A. (N. S.) 1024; Re Shell's Estate, 28 Colo. 167, 63 P. 413, 53 L. R. A. 387, 89 Am. St. Rep. 181; Morrison v. Thoman (Tex. Civ. App.) 86 S. W. 1069; Decker v. Koenig (Tex. Civ. App.) 37 S.W.(2d) 378; Idar v. Uehlinger et al. (Tex. Civ. App.) 49 S.W.(2d) 998; Applehans v. Jurgenson, 336 Ill. 427, 168 N. E. 327, 67 A. L. R. 851, 856.

Under the second, it has been quite generally held as follows: "Undue influence cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised, and exercised in relation to the will itself, and not merely to other transactions." Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98; Morris v. Bailey (Tex. Civ. App.) 16 S.W.(2d) 311; Barry v. Graciette (Tex. Civ. App.) 71 S. W. 309; 28 R. C. L. Par. 106, page 151; 40 Cyc. 1164; In re Pittock's Will, 102 Or. 159, 199 P. 633, 202 P. 216, 17 A. L. R. 218, 227; In re Swartz's Will, 79 Okl. 191, 192 P. 203, 16 A. L. R. 450.

Tested by those rules of law, it seems plain that the showing here made was insufficient to take to the jury the issue as to the overthrow of this will.

There was no error, we think, in the admission of Mrs. Stirling's testimony as to the financial condition of appellant. Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138.

The judgment of the trial court has therefore been reversed, and the cause has been here rendered in appellant's favor.

Reversed and rendered.

### On Motions for Rehearing.

LANE, Justice.

We reiterate that after a careful examination of the statement of facts including the will of Pierson, Sr., we have found no evidence that tends, with any probative force, to show that A. L. Pierson, Jr., in any manner unduly influenced Pierson, Sr., in the making of the will offered for probate or the codicil thereto. There was no evidence upon which it could be reasonably found that A. L. Pierson, Jr., knew that his father contemplated making a will or that he had made one, until it was made, but to the contrary, as stated in our opinion, there was evidence tending strongly to show that he knew nothing of his father's intention to make the will. Contestants, however, in their motions for new trial strenuously insist that we erred in the conclusions above expressed. The trend of our appellate courts is to hold that the tendency to assail last wills of the aged upon the grounds of undue influence and frivolous and inconclusive evidence, chiefly of a speculative character, has grown to such an alarming extent in the late years that it should be checked. To such trend we add our approval. It is no uncommon thing to see testamentary dispositions questioned, and it sometimes happens that they are successfully questioned though testator had been considered a man of strong convictions and purposes and there had never been a suspicion, during his lifetime nor after his death, that the testator was one who could be influenced to do that which he conceived to be wrong or inconsistent with his moral obligations until the contents of his will became known and the expectations of collateral kindred were defeated by its provisions. These kindred frequently think they ought to have been more abundantly provided for in his will, and, because he thought differently, they conclude that some one who was more favorably considered than themselves unduly influenced the making of the will. Because what testator did does not comport with what they believed he should have done, they assume that he must have been unduly influenced to do as he did and upon such assumption they attack his will, though they neither questioned nor doubted his ability to make a will, or to transact his affairs without hindrance by any one, until they discovered that he had made a will with which they were dissatisfied. It is true, we think, that such groundless assaults should cease, and we think it is the plain duty of the courts to give them no encouragement or cognizance.

In re Bartels' Estate (Tex. Civ. App.) 164 S. W. 859, 866, Chief Justice Pleasants, speaking for this court, said: "It is not improbable that, because of the apparent unfairness in the will in the proportion of the estate bequeathed to Mrs. Milam, the jury concluded that they were authorized to do what they conceived to be justice between the parties. However praiseworthy such motive may have been, the law does not authorize a jury to hold a will invalid merely because it does not appear to be a fair and just distribution of the estate of the testator."

Believing the motions for rehearing are without merit, they are overruled.