## BLACK v. BLACK et al.

### No. 6148.

Court of Civil Appeals of Texas. Amarillo.

March 19, 1951.

Rehearing Denied April 16, 1951.

E. T. Miller and E. O. Northcutt, Amarillo, for appellant.

R. H. Cocke, Wellington, for appellees.

PITTS, Chief Justice.

This is a will contest seeking to nullify a former judgment of the County Court of Collingsworth County admitting to probate the will of H. B. Black, deceased, and declaring both the former judgment and the will invalid because of alleged mental incapacity of the testator and undue influence exercised upon him by others. In addition thereto a different purported will alleged to have been previously executed was offered for probate. The testator was 81 years old at the time of his death on April 9, 1950, in Collingsworth County, Texas, and his estate consisted of either separate ownership of, or community interest in (and we express no opinion as to which), a half section of land in Collingsworth County, together with certain personal property. The land was farm land with 276 acres of it in cultivation. There were fourteen children born to the testator and his wife. His wife died on February 17, 1914, and he never married again. Six of the children preceded testator in death but only one of them left a surviving heir, namely, Gene Black, son of Alva Black, deceased. This grandson and eight of testator's children survived him as his sole legal heirs.

The record reveals that on October 16, 1924, testator executed a will in which he devised most of his property to his two youngest children, ages 11 and 13, and each of the older children received only $5 in cash. On January 17, 1950, testator executed a written revocation, in due form, by which he revoked all former wills executed by him. On the following day he executed the will here being contested devising to his eight surviving children and his grandson heretofore named equal shares of his estate and named his oldest son, Allen C. Black, independent executor. On April 24, 1950, the said will was duly admitted to probate without any contest or appeal therefrom. Thereafter on July 13, 1950, contestant, Elmer G. Black, the youngest son of testator, filed a suit in the

County Court of Collingsworth County against all of the other named beneficiaries in the will that had been admitted to probate, seeking to set aside and nullify both the will and the judgment admitting it to probate on the grounds heretofore stated and seeking further to have the former will executed by testator on October 16, 1924, admitted to probate. The party defendants therein named will be designated as proponents and they were, namely, A. C. (Allen) Black, C. A. Black, Eugene Black (the grandson), Mrs. Maggie Morrow, Mrs. Jewell Wattam, Mrs. Carllee Heckathorn, Mrs. Mary Moats and Mrs. Florence King, each of the named women being married and each, respectively, joined by her husband, who was likewise named. On September 4, 1950, the contest was heard by the probate court and the relief sought denied, from which an appeal was perfected to the District Court. A trial there resulted in jury findings to the effect that H. B. Black, the testator, at the time he executed the revocation of all former wills on January 17, 1950, and the last will of date January 18, 1950, had testamentary capacity but that he executed both the revocation and the last will as a result of undue influence exerted upon him by Mrs. Maggie Morrow, Mrs. Jewell Wattam and her husband, Dr. J. M. Wattam, or some one of them. At the close of the evidence proponents had moved for an instructed verdict, which motion was overruled. After the verdict contestant filed his motion for judgment on the verdict denying the purported will of date January 18, 1950, to probate and admitting to probate testator's will of date October 16, 1924, and proponents filed a motion seeking to have the trial court disregard the findings of the jury on the issues of undue influence and for judgment admitting the last executed will to probate. After notice, a hearing was had on the motions and contestant's motion for judgment was overruled but proponents' motion for judgment was sustained. It appearing to the trial court that there was insufficient evidence of probative force to justify the submission of the two issues on the question of undue influence to the jury, the answers of the jury thereto were set aside and judgment was rendered for the proponents admitting to probate testator's last will of date January 18, 1950.

■ Contestant has perfected his appeal from the trial court's judgment and predicates the same upon six abstract "Propositions", as denominated by him, of law. The first "Proposition" presented is as follows: "Where the jury finds that undue influence has been exercised over testator the court is required to indulge the presumption that the jury believe and accepted all probative evidence tending to sustain its verdict." The second one asserts: "Habitual subsection of one to control of another is evidence of purpose to acquire and use undue influence, and some evidence of its acquest." The other four "Propositions" are also mere abstractions of like import similarly presented. Section (b) of Rule 418, Texas Rules of Civil Procedure, 1948 Supplement, provides for a statement of points in a brief upon which an appeal is being predicated, directing the appellate court's attention to the alleged errors of the trial court relied upon for reversal. Such was not followed by contestant in the case at bar. Nowhere in his abstract propositions of law presented does he charge error of any kind on the part of the trial court. It thus makes it difficult for the appellate court to transform such legal abstractions into points of error for consideration. However, this court will, in accordance with its previous custom, again indulge a liberal interpretation of the rules in favor of the sufficiency of contestant's brief and give effect thereto since we believe we can ascertain therefrom the controlling issues to be here determined. Miller v. Thomas, Tex.Civ.App., 226 S.W. 2d 149.

The urgent proposal to set aside and nullify the provisions of testator's last will presents an unusual question in that the testator of the said will devised his whole estate to all of his legal heirs to share and share alike just as they would have inherited under the law of descent and distribution if no will had been executed by testator. We have failed to find a case in which a judgment admitting such a will to probate has been overturned and nullified on any assigned grounds, especially when

it appears no advancements had been made to any of the legal heirs, as was the case here, and all of the testator's objects of bounty have been treated alike and no injustice to any of them has been shown. Proponents have asserted that the estate here involved is a community estate and it appears from the record to be such. However, no complaint is made about the matter and the question is not material if the distribution made of the estate in testator's last will is not disturbed. But the question may be a material one if the estate were distributed according to the terms of the first will executed by testator on October 16, 1924, in which the objects of bounty were not all treated alike.

In this case the evidence reveals that testator's wife died on February 17, 1914, leaving an infant daughter only three months old, who is now Mrs. Florence King, one of the proponents, and the youngest of the fourteen children. The contestant, Elmer Black, was then a little more than two years old and next to the youngest child. Mrs. Maggie Morrow, one of the proponents, was the oldest daughter and was then married and had a family. She then took her sister, Florence, the infant daughter of testator, nurtured the said infant from her own breast, and reared the said child in her own home just as she did her own children. There is evidence to the effect that Mrs. Morrow was the only mother that Florence ever actually knew and that the usual relationship that actually exists between most mothers and their daughters still exists between them. The other older children soon drifted away from their father's home, finally leaving testator at home with the younger children, some of whom died during childhood. Thereafter for a period of about twenty years the testator and his son, Elmer, contestant, lived alone at the old home place. Elmer finished high school as a lad and helped his father operate the farm. On October 16, 1924, when Elmer was 13 years of age and Florence, who lived all the time with her older sister, Mrs. Maggie Morrow, was 11 years old, the testator executed a will in which he named E. B. Haralson executor and devised 120 acres of his land

to Florence Black, his youngest child, and 200 acres of the same to Elmer Black, contestant and next to the youngest child, with each of them to assume a proportionate part of the debts against the said land and they were also to have the personal property, which was to be divided between them or sold and the proceeds applied on the existing debt against the land, after the payment of all other debts, except for the sum of $35, which he devised equally to his other seven children then living. It appears from the record that none of the children, except Elmer, knew about that will until sometime in 1948. The will was kept in testator's lockbox at the bank. This box was later used by both testator and contestant, Elmer Black. About a year prior to the death of testator, contestant moved the will and certain bonds previously purchased by testator, of the face value of $850, to his own personal lockbox. During the latter years Elmer lived on the farm with his father, he operated the farm mostly and helped to transact much of his father's business. During that time he shared in the proceeds of the sales from the farm until he had in his own right $1500 in cash, 17 head of cattle and an automobile when he moved away from his father's farm early in 1945. Elmer married in 1943 but continued to live with his father for a time, after which he and his wife bought them a farm and moved to it where they continued to live. The testator batched alone on his farm for one year after which he moved to Elmer's home in January of 1946. But in April thereafter he voluntarily moved to live with his oldest daughter, Mrs. Maggie Morrow, and her husband. For four years thereafter he visited with all of his children occasionally but made his home with Mr. and Mrs. Morrow where all of the children visited often with him. In the spring of 1948 testator had an attack of some nature and was quite ill and mentally depressed for some time. He became quite a responsibility and help was employed to assist Mrs. Morrow in caring for him, during which time Mrs. Morrow, at her father's request, signed checks for him on his bank account when he needed money until the bank complained

that some other arrangements must be made. On August 23, 1949, all of the other heirs of testator and his deceased wife, including contestant, Elmer Black, signed an instrument authorizing the bank to honor checks drawn on testator's account and signed by Mrs. Morrow for the care and comfort of the testator. During that illness of testator, some of the children, and particularly contestant, wanted to send testator either to a public or a private mental institution, but the daughters, and particularly the two older daughters, Mrs. Morrow and Mrs. Wattam, protested and insisted there were enough children to care for him. Contestant testified that he declined to care for his father further because he was unable to do so. The testimony reveals that testator regained his normal health for a man of his age some time in 1949 and signed his own checks again, enjoyed company and visited among his children. While visiting in the home of his daughter and son-in-law, Dr. and Mrs. Wattam, in January of 1950, he executed the two instruments being here contested. Thereafter he became ill with an attack of pneumonia and was taken to a local hospital two weeks before his death on April 9, 1950.

It was not unnatural for a father to draw a will such as testator first drew on October 16, 1924, bequeathing practically all of his estate to his two youngest children, ages 11 and 13, since the other younger children had died and the older children were all grown, had established homes of their own and were probably getting along as well as could be expected. Contestant, Elmer Black, testified that his father told him he had made such a will because Elmer was the only one still living with him and because he had never done anything for the baby girl, Florence. After the children all grew up, including Elmer and Florence, married, established homes of their own and all of them, particularly Elmer, seemed to be getting along all right and equally well, it was not unnatural for the father to revoke his former will and make a new one, in which he treated all of his children, including a grandson, alike in devising and distributing his estate equally between them. It was not unnatural for him to

voluntarily go live with his oldest daughter, Mrs. Morrow, when he became old, emaciated and needed somebody to care for him. Under the facts and circumstances here revealed, it was not unnatural for Mrs. Florence King, the youngest daughter, to elect to take an equal share of the estate along with all of the other children under the provisions of the last will executed rather than to join Elmer, contestant, in seeking to have the first will probated which devised practically all of the estate to her and Elmer. It clearly appears from the record that testator loved all of his children but he selected Mrs. Morrow's home as the place he wanted to live and and spend the remainder of his declining years. C. J. Fly, speaking for the San Antonio Court of Civil Appeals, in the case of Smith v. Mann, 296 S.W. 613, 615 writ refused, said in part: "Wills executed through love, kindness, and gratitude are not caused by undue influence in the eyes of the law."

■■■ The Galveston Court of Civil Appeals, speaking through Justice Lane, quoting from a Missouri case, held in the case of McCannon v. McCannon, 2 S.W. 2d 942, 945, that, in a will contest case such as this, courts will scan and scrutinize the testimony with a searching, though impartial, eye and weigh the evidence in the scales of reason and experience, in order to determine whether or not such furnishes sufficient basis for the submission of delicate questions to a jury, and that such should be done for every reason but particularly for the reason that "juries [often] seize an opportunity to break wills, never doubting their ability better to decide what should be done with a man's property than the man himself could do." We have no doubt but what the trial judge in this case carefully considered these matters in weighing proponents' motion to disregard jury findings on the issue of undue influence and enter judgment for them. The trial court was likewise aware of the fact that the burden of establishing his allegations of undue influence rested upon the contestant but that, in determining whether or not the evidence was sufficient to support the findings of undue influence, the said evi-

dence must be weighed in the light most favorable to such findings. Unless it appears that the trial court abused its discretion in these matters, its judgment must be affirmed.

The rules of law governing the issues here presented are well established and well recognized. However, no two cases are alike and it is impossible to lay down any hard and fast rules which will accurately govern the question as to whether a given record contains affirmative probative evidence of undue influence. Each case must stand on its own bottom as to the legal sufficiency of the facts proven. Long v. Long, 133 Tex. 96, 125 S.W.2d 1034.

Undue influence is defined as that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist. It cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised in relation to the revocation or will itself and not merely in other transactions. Mere persuasions, entreaties or mere suspicion of undue influence will not invalidate a revocation or a will on such grounds. Evidence that a former will, differing from one sought to be annulled on the grounds of undue influence, had been destroyed or revoked would not establish undue influence. The fact that a testator was under the general and even controlling influence of other persons in the conduct of his affairs will not suffice to invalidate the will unless that influence was specially exerted upon the testamentary act. To set aside a judgment admitting the will to probate on grounds of undue influence, the burden is on the contestant to show that testator was induced to act contrary to his own wishes and make a different will from one he would have made if left entirely free to act according to his own judgment and discretion. Stolle v. Kanetzky, Tex. Civ.App., 259 S.W. 657, writ refused.

This court held in the case of Burgess v. Sylvester, 177 S.W.2d 271, affirmed by the Supreme Court 143 Tex. 25, 182 S.W. 2d 358, that in order to invalidate a will on the grounds of undue influence, such must have been exercised at the time of execution of the will and that such must have resulted therefrom. We further held there that a will cannot be set aside on proof of facts showing no more than that an opportunity to exercise such influence may have existed or on proof of facts raising a bare suspicion that such undue influence may have been exercised. In that case the jury found that the testator had mental capacity but executed the will as a result of undue influence just as the jury found in the case at bar. But the trial court there overruled contestant's motion for judgment and sustained proponents' motion to disregard the jury findings on the question of undue influence and to enter judgment for them. This court affirmed the trial court's judgment in that case and our judgment was affirmed by the Supreme Court.

The two instruments here being contested were separately executed on separate days and witnessed by different witnesses. The facts and circumstances surrounding their executions must be separately considered, although contestant has seen fit to discuss them jointly as if the transactions had been one and the same.

Concerning the execution of the revocation of all former wills on January 17, 1950, Bob Glenn testified that he had lived in Wellington 60 years and had known testator 35 or 40 years; that on the day the instrument was executed Dr. Wattam told him the testator wanted him to come by the house and sign an instrument; that he and Mooney Stall went by Dr. Wattam's home soon thereafter where they found testator waiting; that testator said, "I want to bother you a little bit to sign this paper"; that he saw testator sign the instrument and he and Mooney Stall witnessed it at the request of testator; that nobody but him, Stall, testator and Dr. Wattam were present when the instrument was signed; that the instrument was not read aloud to them before signing and no further discussion was had about its contents; that he visited with testator for a little while after the instrument was signed; that in his opinion testator was capable

of transacting his business and knew what he was doing on that occasion; that as he left the house Mrs. Wattam came in from the street but she was not there when the instrument was executed. As to the execution of the revocation, the testimony of the other witness thereto, Mooney Stall, corroborated that given by Bob Glenn. The instrument in question appears to have been executed as required by law and 'states, "I, H. B. Black, hereby expressly revoke all wills by me heretofore made". The record does not reveal who drew the instrument or when it was drawn. There is no evidence that any member of testator's family or anybody else ever discussed the instrument in question or its contents with testator, other than the testimony given by the witnesses thereto. Applying the rules of law previously cited to the evidence presented and heard, it is our opinion that the trial court was justified in holding that the evidence was insufficient to warrant the submission of an issue to the jury on the question of undue influence concerning the execution of the revocation and in setting aside the answer of the jury thereto. Since this instrument revokes all former wills executed by testator, the first will executed by him of date October 16, 1924, stands revoked, regardless of the validity of the last will executed by testator of date January 18, 1950, and, in any event, the heirs of testator will share equally in a distribution of the estate whether the judgment admitting the last will to probate is sustained or not.

As to the latter will, most of testator's children and several of his neighbors for many years testified. The evidence reveals that the testator was a man of affairs, was active and transacted his own business matters up until some two or three weeks before his death, except for the assistance that contestant gave him in former years and for the matters that his oldest daughter, Mrs. Maggie Morrow, helped him with in 1948 and 1949 when he was seriously ill. The record contains as exhibits approximately 20 cancelled checks that testator gave and signed himself after the execution of the last will on January 18, 1950, and before his death on April 9, 1950, and they were honored by the bank and paid. Nine of the checks were given in March before testator died the following month and the last one of those checks was dated March 14, 1950. The record also shows that he was a man of strong will power and not easily influenced. It likewise reveals that Hon. C. C. Bishop, attorney at law, Wellington, Texas, drew the will in question but was not present when it was executed. The first paragraph of this will contains a clause revoking all former wills executed by testator in the following language: " * * * do make and publish this, my last Will and Testament, hereby revoking all Wills by me at any time heretofore made." The will then bequeaths testator's estate, both real and personal, to his children and grandson to share equally and named each of them. The evidence reveals that testator's oldest daughter, Mrs. Maggie Morrow, at the request of her father took the information for the contents of the will up a long flight of stairs, to Mr. Bishop's office, several blocks away, where the will was drawn according to the information furnished and the same was returned to Mrs. Morrow, who took it back to her father. Mr. Bishop testified that Mrs. Morrow told him what her father wanted put in the will and he fixed it accordingly. He further testified that he had been representing testator professionally before for which testator paid him. Mrs. Morrow testified that she took the information to Mr. Bishop at the request of her father and told Mr. Bishop what her father had said; that the will was drawn and she took it back to her father but she was not present when it was executed, and never told her father what to put in his will. The evidence further reveals that testator read the will over himself after it was written and before it was executed and that the same was read again by Dr. Wattam in his presence and in the presence of the attesting witnesses just before it was signed by them and that it was executed with the usual formalities and witnessed at the request of testator by R. Wilkerson and L. C. Brinkley; that Wilkerson died before the trial of this case but his testimony, as was given in the

probate court, was admitted in the trial of this case. The other witness to the will, L. C. Brinkley, testified at the trial. He testified that the will was read in full to all of them present by Dr. Wattam before it was executed and that the testator, the witnesses to the will, Dr. and Mrs. Wattam and some other lady were present when the will was executed. Dr. and Mrs. Wattam corroborated his testimony except that they said no other lady was present at the time the will was executed. There is no evidence tending to show that any of the beneficiaries uuder the will or anybody else made any suggestions to the testator about the contents of the will in question or about any of his duties toward any of his heirs. Assuming that he may have been influenced by somebody in the matter, certainly nobody influenced him to discriminate between his children.

There is no evidence of any specific act or acts that Mrs. Morrow, Mrs. Wattam or Dr. Wattam did, which induced testator to execute the will in question. The record reveals that the testator trusted Mrs. Morrow, his oldest daughter, to take, nurture, care for and rear his infant daughter when his wife died; that he voluntarily went into her home to spend his declining years and selected her and trusted her to look after him during the latter part of his second childhood; that he trusted her to sign his checks for him and look after a part of his business for him during his period of illness in 1948 and 1949; and that he selected her and trusted her to take the necessary information some eight or nine blocks and up a long high flight of stairs to his attorney's office with the request that his will be drawn devising his estate equally to the objects of his bounty. There is no evidence showing or tending to show that Mrs. Morrow ever disappointed her father in any request he made of her or that she ever violated the trust her father placed in her. When she was looking after her father during his serious illness in 1949 all of the other heirs, including contestant, trusted Mrs. Morrow, by signing an instrument authorizing the bank to honor any checks that Mrs. Morrow, in her own judgment, may sign on the testator's

bank account and there is no evidence that she ever violated that trust. There is evidence to the effect that testator asked Mrs. Morrow to assist him in getting his last will drawn and she did what he asked her to do and no more, but there is no evidence showing or tending to show that Mrs. Morrow, Mrs. Wattam or Dr. Wattam ever asked testator to make a will or even made any suggestions to him about the will or its contents. The evidence reveals that testator was associated with his children much but such association is no presumption that undue influence was exercised over him by any of them.

The contestant relies largely on the case of Long v. Long, supra, and has cited it several times in support of his contentions. There was an entirely different factual situation in that case as compared with the case at bar. In that case the testatrix, Mrs. Martha Long, was not only old, but she was extremely fragile, afflicted with several diseases which caused her pain, worry, inconvenience and she spent much time in bed. Her mental vigor was greatly weakened and impaired by age, sickness and grief caused by the death of a loved one. Her will as written did not leave her property to her heirs according to the laws of descent and distribution but it was written so her son, Frank Long, who was insisting that the will be admitted to probate, would receive more than he would have received under such laws. For that reason the Supreme Court said, "According to natural law, the will is unfair to this contestant", [133 Tex. 96, 125 S.W.2d 1037.] Frances Mae Long a granddaughter of the testatrix. Frank Long had been looking after his mother's business and had in his possession a large part of her liquid assets. He also employed an attorney to write his mother's will and paid him for it. He gave the attorney instructions as to how to write the will and what disposition to make of his mother's estate. He had some changes made in the draft of the will after it was written and before it was taken to his mother to sign. He took the attorney to his mother to have the will executed. The said attorney testified that he either read the will to testatrix

or told her in substance of its contents but thought he read it to her except for the description of lands. The testatrix signed the will without inquiring about its contents. It appears from the record, as stated in the opinion, that there was evidence showing or tending to show that the testatrix did not fully understand the terms of the will and that she signed the same without having had it fully explained to her. In so far as the record reveals as shown by the appellate courts, the testatrix did not ask Frank Long, her son, to have the will drawn. He had handled his mother's business in detail and he had the will drawn after discussing the matter with some of the other children. He was named as one of the executors of the will, took the will after it was drawn and kept possession of it until after his mother's death. There are many material distinctions existing between the facts in that case and the facts in the case at bar. We think the court properly held that a fact issue was raised in the Long case.

Contestant contends that undue influence may be established by circumstantial evidence. Such may be done provided the circumstances are strong and convincing enough and of such probative force to lead a well guarded mind to a reasonable conclusion that such influence was exercised by the alleged party and that it controlled the will power of the testator at the very time the will was executed. Taylor v. Small, Tex.Civ.App., 71 S.W.2d 895. Under such circumstances, before the evidence is sufficient to submit an issue on undue influence to a jury, it must be more than purely speculative and when its probative force is so weak that it only raises a mere suspicion or surmise, the evidence is insufficient to support such an issue. Where the evidence on such an issue is so indefinite and uncertain as to preclude a finding, the issue should not be submitted. Federal Underwriters Exchange v. Bullard, Tex.Civ.App., 128 S.W.2d 126. The rule has been well established that the issue of undue influence is not raised unless the record contains some evidence of probative force that such influence was exercised, and that it subverted and overpowered the will of testator and caused the execution by him of a will which he would not have executed but for such influences. Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, writ refused, and other authorities there cited.

In view of all of the authorities herein cited, it is our opinion that the trial court properly held that the evidence was insufficient to raise the issue of undue influence as to either of the instruments executed by the testator and that it properly sustained respondents' motion to disregard the jury answers to both issues on undue influence and render judgment for them and against contestant. Gainer v. Johnson, Tex.Civ.App., 211 S.W.2d 789; Pullen v. Russ, Tex.Civ.App., 209 S.W.2d 630; Brodt v. Brodt, Tex.Civ.App., 91 S.W.2d 837; Pierson v. Pierson, Tex.Civ.App., 57 S.W. 2d 633. We therefore overrule all of appellant's complaints to the contrary and affirm the judgment of the trial court.